# MULLINER v. McCORNICK & CO., BANKERS, et al.

No. 4294.   Decided February 1, 1927.   (257 P. 658.)

558

560

H. *Van Dam, Jr.,* and *G. A. Iverson,* both of Salt Lake City, and *Arthur Woolley,* of Ogden, for appellant.

*Frank Holman,* of Seattle, Wash., for respondent McCornick & Co.

*James Ingebretsen,* of Salt Lake City, for respondent Walker Bros. Bankers.

HANSEN, J.

The plaintiff brought this action in the district court of Salt Lake county upon four alleged causes of action. The first two alleged causes of action arise out of the same transaction, and the third and fourth alleged causes of action also arise out of the same transaction; but the first and second alleged causes of action arise out of a transaction separate and distinct from the third and fourth causes of action. Trial was had by the court sitting without a jury. At the conclusion of plaintiff's evidence, the defendants and each of them moved for a judgment of nonsuit. The trial court granted the motion for a nonsuit as to the first and second causes of action, but denied the motion as to the third and fourth causes of action. Judgment was duly made dismissing plaintiff's first two causes of action upon the motion of defendants for a judgment of nonsuit. At the conclusion of the evidence, as it affected the third and fourth causes of action, the trial court found the issues on these two causes of action in favor of the defendants and against the plaintiff, no cause of action, and made findings of fact, conclusions of law, and judgment in conformity therewith. The plaintiff prosecutes this appeal from the judgments so made and entered as to each and all of the alleged causes of action.

The first two causes of action, as set out in plaintiff's complaint, are as follows:

"(1)   That at all times herein alleged defendants were and now are corporations under the laws of Utah.

"(2)   That on or about March 16, 1921, at Salt Lake City and county, Utah, at the special instance and request of defendant Mc-Cornick & Co., Bankers, and for its use and benefit, one Ernest R. Woolley delivered and turned over to said McCornick & Co. sundry promissory notes in the aggregate sum and value of $10,000, a list

of the makers, and the amounts, and the maturity dates of said notes being hereto attached and marked 'Exhibit A.'

"(3) That, in consideration of the delivery of said notes to said defendant, the said defendant agreed to hold the same for the account of said Ernest R. Woolley, and to account to him for the value thereof, to wit, the amount of $10,000 (and credit and deposit said sum to his account).

"(4) That said defendant McCornick & Co. has failed to keep and hold the said notes, and all of them, and to account to said Woolley therefor (or to credit or deposit the said sum to his account), but, on the contrary, has wrongfully converted the said notes to its own use, and sold or disposed of the same, without accounting to the plaintiff or to said Woolley therefor to their damage in the sum of $10,000.

"(5) That neither said plaintiff nor said Woolley has received any consideration whatsoever for said notes or any of them.

"(6) That, after the accrual of the cause of action aforesaid, and on or about the 18th day of May, 1921, said McCornick & Co. sold, transferred, delivered, and handed over all its property, real, personal, and mixed, to the defendants Walker Bros., Bankers, Assets Realization Company, and Securities Realization Company, which said property is now held by said defendants, and that no part or portion of the assets of said McCornick & Co. was reserved to pay the above-mentioned demand or claim.

"(7) That in taking over the said assets of the said defendant McCornick & Co., and in consideration of the assignment and delivery to them, as aforesaid, the said defendants Walker Bros., Bankers, Assets Realization Company, and Securities Realization Company, assumed and agreed to pay all of the debts and liabilities of the said McCornick & Co., including the debt and liability aforesaid. That, by reason of the taking over of all of the said assets, and of the assumption of all of the debts and of the said liabilities, the said McCornick & Co. has now no assets, and by the contract of each and all of the said parties said defendant is now a mere holding shell, and functions only through the said persons who now have possession and control and dominion over all of the said assets.

"(8) That prior to the commencement of this action said Ernest R. Woolley, for value, sold, assigned, and transferred to this plaintiff all right, title, claim, and interest of, in, and to the aforesaid claim and cause of action.

"And for a second cause of action, plaintiff alleges:

"(1)   Plaintiff realleges and reiterates paragraphs 1, 2, 3, 4, 5, and 8 of his first cause of action.

"(2)   That for many years prior to and up until the 18th day of May, 1921, said McCornick & Co. carried on in Salt Lake City, Utah, a large and extensive banking business. That it had a large number of depositors and many correspondent banks, and on said date owned tangible assets of about $8,000,000, and in addition its good will and other intangible assets. That on the 18th day of May, 1921, the said McCornick & Co., by previous arrangement with the defendant Walker Bros., Bankers, assigned, transferred, conveyed, delivered, and handed over to the said Walker Bros., Bankers, all of the properties of every kind and nature and wheresoever situate, of the said McCornick & Co. and all its rights and interests, tangible and intangible. That the personal properties of said McCornick & Co., including its moneys, accounts, books, and records, were removed to the banking house of the said Walker Bros., Bankers, during the days and nights between May 18, and May 20, 1921. That said Walker Bros., Bankers, at the time of said removal and in the forenoon of May 18, 1921, represented and stated to the patrons, creditors, and depositors of McCornick & Co., including said Ernest R. Woolley, and all those having claims against said McCornick & Co., that it had taken over all of the assets of said McCornick & Co., and that it had assumed all of the liabilities of said company, and said defendant Walker Bros., Bankers, posted a notice for the information of said patrons, creditors, and depositors of the said McCornick & Co. at the bank of said McCornick & Co. containing such representations; and the chairman of the board of directors of said Walker Bros., Bankers, acting for and on its behalf, so stated and represented to said patrons, depositors, and creditors, and also represented to and agreed with the said McCornick & Co., for the benefit of said patrons, creditors, and depositors, that it, the said Walker Bros., Bankers, had assumed all of the liabilities of the said McCornick & Co., Bankers. That said representations were made for the purpose and with the intention that said Ernest R. Woolley and other patrons, creditors and depositors, should rely thereon, and with the knowledge that they did so rely, and would be and were thus lulled into security thereby, and would thus make no attempt to collect their claims and demands as against said McCornick & Co. by actions or proceedings at law or in equity, or by appeal to the state banking department, or in any other manner, but would rely upon being paid by said defendant Walker Bros., Bankers.

"(3)   That on May 18, 1921, and for a number of years prior thereto, said E. R. Woolley was a large depositor, patron, and creditor

of the said McCornick & Co., as appeared from the books and records of said company, and was such a depositor, patron, and creditor both as to the matters herein referred to and upon other claims, deposits, and credits. That said Woolley, being thus interested and being advised on May 18, 1921, that the said bank of McCornick & Co. was being moved, investigated the said matter on said date and learned of the actions, representations, notices, and statements and agreements of Walker Bros., Bankers, in the preceding paragraph alleged, and accepted the same and relied thereupon, and looked to the said Walker Bros., Bankers, for the payment of all the moneys previously and then due to him from the said McCornick & Co., including the claim in this cause of action sued upon. That said Woolley, so relying and being lulled into security thereby, did not pursue, but gave up, all remedy which he had by immediate action through the state banking department or the courts, or at all, and relied upon the said Walker Bros., Bankers, for payment of this and other obligations due him.

"(4) That said Walker Bros., Bankers, gave no consideration for the assets and business and good will and properties of the said McCornick & Co., Bankers, except its assumption of the obligations of said company as aforesaid. That by reason of the taking over of all of said assets and properties and of the assumption of all of the said liabilities as aforesaid, the said McCornick & Co. was left and has no assets, and said defendant is now and since May 18, 1921, has been, a mere holding shell, without any business or assets, and has been and is wholly insolvent, and it would serve no purpose and would avail the plaintiff nothing to take a judgment against said defendant alone upon the obligations herein sued upon or to attempt to collect anything whatever from it unless or until sufficient assets are restored to it by the other defendants herein, or its assets so removed as herein alleged are applied to the payment thereof. That plaintiff is informed and believes, and therefore alleges, that said assets were sufficient to pay all of the liabilities of the said McCornick & Co., and that in general and with the exception of claims and demands of the said Ernest R. Woolley, said depositors, patrons, and creditors of said McCornick & Co. have received from said Walker Bros., Bankers, settlement of their claims in the full amount thereof.

"(5) That plaintiff is informed and believes and therefore alleges that certain of the assets of the said McCornick & Co. have since said transfer and removal to said Walker Bros., Bankers, by agreement between and consent of the said defendant Walker Bros., Bankers, and McCornick & Co., have been turned over to the said defendants Assets Realization Company and Securities Realization Company. That

all of said defendants had knowledge of the facts, conditions, representations, notices, and agreements as hereinbefore alleged, and that the said assets in the hands of the said two defendant companies were taken subject to the rights of said Woolley and of the plaintiff herein, and the right to have said claim satisfied therefrom. That the said defendants and each of them have refused to pay the said claim, although demanded so to do, and said Woolley was damaged and defrauded by the transfer of said properties as aforesaid, and plaintiff alleges that said transfer of said properties was made with the intent to delay, hinder, and defraud said Woolley of his lawful debts and demands, and that said transfer from McCornick & Co. to Walker Bros., Bankers, and the subsequent transfers to the other two defendants as alleged of certain of said assets, are therefore void, and the said defendants and each of them are liable to the said plaintiff and charged with the payment of said claim, and are estopped to deny liability to him."

The third and fourth causes of action, as set out in plaintiff's complaint, are as follows:

"For a third cause of action, plaintiff alleges:

"(1) Plaintiff reiterates and realleges paragraph 1 of his first cause of action.

"(2) That on or about the 31st day of July, 1920, at Salt Lake City and county, state of Utah, at the request of defendant McCornick & Co., and for its use and benefit, one Ernest R. Woolley paid to the Stockgrowers' Bank & Trust Company, a banking corporation then doing business at Pocatello in the state of Idaho, the sum of $30,000 as a loan by the said McCornick & Co., Bankers.

"(3) That, in consideration thereof, the said defendant McCornick & Co. promised to credit to the account of said Woolley in said bank the sum of $30,000 on or before the 3rd day of August, 1920, on delivery to the said McCornick & Co. by said Woolley of the certain promissory note made by the said Stockgrowers' Bank & Trust Company to the said McCornick & Co., bearing date the 30th day of July, 1920, for the principal sum of $30,000 and evidencing said loan.

"(4) That on or about the said 3rd day of August, 1920, said Woolley delivered to said McCornick & Co. the said note evidencing said loan, and the said defendant accepted same as a deposit and agreed to credit to the acount of said Woolley the said sum of $30,000 and gave him its receipt therefor, and its agreement in writing to make such deposit.

"(5)    That the said McCornick & Co. failed to deposit to the credit of said Woolley the said note or the said sum of $30,000, or any part thereof, and so continues to fail to deposit or repay the same to said Woolley or to the plaintiff, although demanded so to do.

"(6)    Plaintiff reiterates and realleges paragraphs 6, 7, and 8, of the first cause of action herein.

"And, for a fourth cause of action, plaintiff alleges:

"(1)    Plaintiff reiterates and realleges paragraphs 1, 2, 3, 4, and 5 of his third cause of action herein.

"(2)    Plaintiff reiterates and realleges paragraphs 2, 3, 4, and 5 of his second cause of action herein.

"(3)    Plaintiff reiterates and realleges paragraph 8 of his first cause of action herein.

"The plaintiff prays judgment on each and all of the causes of action, as follows:

"Upon his first cause of action for the sum of $10,000, and for interest.

"Upon his second cause of action, for the sum of $10,000, and for interest.

"Upon his third cause of action for the sum of $30,000, and for interest.

"Upon his fourth cause of action for the sum of $30,000, and for interest.

"That the transfer of its assets by McCornick & Co., Bankers, to the other defendants as herein alleged, be adjudged fraudulent and void as against the plaintiff, and that said assets be ordered sold and from the proceeds of the sale thereof plaintiff's claims be paid.

"That a receiver be appointed by this court to wind up the affairs of said McCornick & Co., Bankers, and to sell and dispose of its said assets, and pay the said claims of its creditors, including this plaintiff.

"That plaintiff have such other and further relief as may be just, with the costs of this action."

Exhibit A, referred to and made a part of plaintiff's complaint as to the first two causes of action, consists of a list of 43 notes, some maturing in 1923, some in 1924, and some in 1925, and aggregating the sum of $10,000.

The defendants McCornick & Co., Bankers, a corporation, and Walker Bros., Bankers, a corporation, have each filed separate answers, and the defendants Assets Realization

Company, a corporation, and Securities Realization Company, a corporation, filed a joint answer to plaintiff's complaint. The answers of each and all of the defendants deny generally the allegations of plaintiff's complaint, except that they admit that the defendants were and now are corporations under the laws of the state of Utah, and McCornick & Co., Bankers, admit that on or about the 18th day of May, 1921, it transferred and delivered, for a good, valuable, and sufficient consideration all of its assets and property as more fully appears from the contract attached to the answer of McCornick & Co., Bankers, and made a part thereof. Each and all of the defendants, in their respective answers, further allege that the notes referred to and described in said first and second causes of action were and are void under and by virtue of the provisions of the laws of the state of Utah relating to the issue and sale of securities commonly known as the Securities Act or Blue Sky Law (Laws 1919, c. 109), and that therefore said notes were and are wholly uncollectible and worthless. Defendants further set up as a defense, in their respective answers to each of the plaintiff's causes of action, that the transaction, business, and alleged obligations and liabilities referred to and described in said causes of action were entirely beyond and outside the authorized business of McCornick & Co., Bankers, and would be and were ultra vires, unlawful, and void, and would be and were beyond the capacity and powers of any officer, agent, or employee of said bank, and were never duly and regularly or otherwise or at all authorized, ratified, or adopted as the corporate or other act or transaction or business of said McCornick & Co., Bankers. Exhibit A, which is attached to the answer of McCornick & Co., Bankers, contains specific and definite provisions as to the terms and conditions under which Walker Bros., Bankers, took over the business of McCornick & Co., Bankers.

Walker Bros., Bankers, also filed an amendment to its original answer, in which amendment it alleges in sub-

stance: That McCornick & Co., Bankers, prior to May 17, 1921, was one of the leading banking institutions of the intermountain section, with deposits ranging upwards of $10,000,000, represented by about 10,000 depositors; that said banking institution, in the month of May, 1921, was in an unsafe and unsound condition; that the bank commissioner of the state of Utah, on May 17, 1921, called together and assembled the representatives and heads of several clearing house banks of Salt Lake City and represented to them that, unless steps were taken and measures adopted by said McCornick & Co. and the other banks of Salt Lake City to provide security for, or payment of, the deposits and bills payable and liabilities of McCornick & Co., he would be obliged to and would take over said bank and place it in liquidation; that thereupon the books and records of said McCornick & Co. were gone over by the representatives of the said several banks of Salt Lake City, to ascertain the value of the assets and the amount of liabilities of said McCornick & Co.; that, as a result of the investigations, deliberations, and negotiations, a plan was worked out and concurred in which was later reduced to writing and executed and delivered by all concerned, as the result whereof the defendant Walker Bros., Bankers, assumed and agreed to pay the liabilities of said McCornick & Co., Bankers, to its depositors for deposits and balances thereon, on certain bills payable as shown by the books of McCornick & Co. at the close of business on May 17, 1921; that at the close of business on the 17th day of May, 1921, and at all times prior and subsequent thereto, the books, records, statements, and files of McCornick & Co., Bankers, did not contain or include any showing of any name or nature of any demand made, account asserted, or liability of any nature, to or in favor of the plaintiff or plaintiff's assignor, upon the alleged items of indebtedness or liability set out in plaintiff's complaint, but on the contrary showed that E. R. Woolley was overdrawn upon his account in the sum of $64.92; that, after Walker Bros., Bankers, took over the business of said Mc-

Cornick & Co., the said E. R. Woolley continued intermittently to make deposits and to issue checks with and upon his account with the Walker Bros., Bankers, until on or about February 13, 1923; that, on the 1st day of each month during the time said E. R. Woolley carried a deposit account with McCornick & Co., Bankers, and Walker Bros., Bankers, he (the said E. R. Woolley) was furnished monthly statements by both of said banks, together with returned canceled checks, but that he (E. R. Woolley), during all of said period, failed and neglected to challenge, open, or enter any complaint as against said statements or the accounts represented thereby or to demand or assert credits therein for the items set out in the complaint or otherwise or at all; that the deposit account held by plaintiff's assignor, said E. R. Woolley, with McCornick & Co., as absorbed by this defendant Walker Bros., Bankers, was in due course fully adjusted, settled, liquidated, and closed by the defendant Walker Bros., Bankers, without dispute or contest by said E. R. Woolley.

The defendant further alleges and sets out in its answer other transactions had with plaintiff's assignor E. R. Woolley prior to the commencement of this action, but that at no time did the said E. R. Woolley make claim for any credit on either of the items set forth in plaintiff's complaint; that, by reason of the failure, neglect, and want of due care and diligence on the part of plaintiff and his said assignor, E. R. Woolley, in not informing the defendant Walker Bros., Bankers, of any claim held by them, the said Walker Bros., Bankers, has been by them lulled into a sense of security and radically changed its position and assumed great burdens and responsibilities and to become involved in and to carry out the complex, intricate, perplexing, burdensome transaction provided for in said contract for taking over the business of McCornick & Co., Bankers, without proper or any due or timely advice of the alleged claim of the plaintiff; that, by reason of the premises, plaintiff's assignor E. R. Woolley and said plaintiff (1) suffered and allowed

an account to become settled and stated by and under the terms of which neither McCornick & Co., Bankers, nor this defendant are indebted or obligated to said plaintiff or his assignor upon either or both of the items set out in the complaint or otherwise or at all, (2) the said plaintiff's assignor and the said plaintiff have lost, by their unreasonable delay, laches, and want of due care and diligence, whatever rights, if any, they had to enforce and are barred from asserting or enforcing, said alleged accounts and items as set out in the complaint, (3) said plaintiff's assignor, E. R. Woolley, and the said plaintiff, have become and are estopped to assert or enforce the said alleged accounts, demands, or items set out in the complaint or any rights they may ever have had thereunder.

McCornick & Co. also filed an amendment to its answer which is substantially the same as the amendment filed to the answer of Walker Bros., Bankers.

The defendants pray judgment that plaintiff take nothing by its complaint and that defendants be awarded their costs and for general relief.

After the court had entered its judgment in this action, a motion for a new trial was made by the plaintiff, which said motion was denied.

Upon this appeal the plaintiff has sixty-five assignments of error; among them, as affecting the first two causes of action, are the following:

(1) That the court erred in sustaining the motion of McCornick & Co. and Walker Bros., Bankers, for a nonsuit of appellant's first and second causes of action.

(2) That the court erred in entering its judgment herein dismissing appellant's first and second causes of action on nonsuit.

During the course of the trial, Ernest R. Woolley was called as a witness for the plaintiff and testified in part as

follows, with respect to plaintiff's first and second causes of action, on direct examination: That he has been doing business with McCornick & Co. between 10 and 15 years. That in 1921 Melvin H. Sowles was vice president of McCornick & Co. That during the years 1920 and 1921, up to the time the McCornick bank was taken over by Walker Bros., he had frequently had occasion to do business with McCornick & Co., sometimes once or twice a day and sometimes once or twice a week. That he borrowed money, made deposits, and "transferred clearance" of a good many checks through the bank, in fact did a general banking business. That Melvin H. Sowles made loans and transacted general banking business for the McCornick bank, and that the witness E. R. Woolley did a great amount of business with Melvin H. Sowles as an officer of McCornick & Co., Bankers. That the character of the business E. R. Woolley transacted with Melvin H. Sowles was about making deposits and making loans—ordinary banking business. Further:

"Q. What, in what volume and amount were the loans that you made with him directly for the bank? A. From five hundred to a quarter of a million dollars. Q. Were there other smaller loans made, $100,000? A. Oh, yes; from $500. Q. You said five hundred? A. To a quarter of a million. Q. And can you give the court an idea of how many transactions that you had with him prior to, let's say July 30, 1920? A. During the time that Mr. Sowles was in the bank I think I am conservative in saying that I had 100 to 150 loans, transactions of borrowing money, depositing, acts of banking business—an estimate; it is not accurate at all. It is just my judgment. Q. Do you know when you made loans with Mr. Sowles whether he consulted with anybody else in the bank? A. I do not know as to that. Q. Did he ever, so far as your knowledge goes, consult with anybody else in the bank? A. Not to my knowledge. Q. Now, I will direct your attention to the conversation that you referred to in relation to $10,000 of notes which you stated was about the 1st of March, 1921, and ask you to state where that conversation took place. A. In my office in the Newhouse Building, sixth floor. Q. I will ask you who was present at that conversation. A. As I recall, no one except Mr. Sowles and myself, during the fore part of the conversation. The latter part of the conversation Mr. Swan was there. Q. I will ask you what the cir-

cumstances were that brought about the conversation. A. As I recall, I was going East, and Mr. Sowles came to the office to discuss some matters with me about some interstate. Q. Some interstate? A. Some interstate matters and some of my general matters at the bank. Q. Now state what was said in reference to this particular $10,000 that is the item referred to, if anything. A. Mr. Sowles stated to me that I was overdrawn at the bank, and that before I returned McCornick & Co. might need some more securities, some more security, and some more farmers' notes, stated to me also that I owed him some notes on a previous deal, and he said if McCornick & Co., if we should want some more, he said, 'I wish you would authorize some one to deliver them; and I said, 'Well, I will authorize Swan to deliver them for you;' and I said, 'I will be very pleased to do it, and you give Swan a receipt for the bank.' So I called Swan and told him to deliver to Melvin, or to McCornick & Co., rather, such notes as he asked for while I was gone and take the receipt of McCornick & Co. for them; and I said to him, 'Anything that is delivered, why of course I shall have credit for,' and he said, 'You surely shall; we will take care of that.' Q. All right, what did you do then? A. I called Mr.— I told Mr. Swan to deliver such notes as McCornick & Co. wanted and take their receipt for them. Q. Did you call Mr. Swan in, or did he come in while Mr. Sowles was there? A. Well, as I remember, I called him into the room when Mr. Sowles was with me. Q. Did you have anything further to do with the delivery of these notes? A. I did not. Q. Did you have any conversation with Mr. Sowles after that? A. In June or July, after I called Mr. Sowles at Walkers' and told him that I had found that they had not given me credit for all of the notes that had been delivered, and he said that will have to be adjusted, the matter adjusted with the bank here, and I said all right. Q. Now, you called attention to other notes that were owing? A. Yes. Q. Did you owe McCornick some notes at that time? A. I owed McCornick, as I remember, $5,000 worth of notes at that time. Q. And was that on a separate transaction? A. It was."

On cross-examination, the witness testified:

"Q. Notwithstanding that you never made or caused to be made any formal claim of any name or nature upon either one of these two items here sued upon, until just before February 6, 1923, did you? A. Oh, yes; oh, yes. Q. To whom and when and where? A. As soon as I got my audit I called Mr. Sowles at Walkers' and told him I wanted those credits. Q. What did you tell him. A. I said these credits I should receive at McCornick & Co., I haven't got them. He said,

'That will have to be adjusted.' He said, "What are they?' I read it to him. Q. He said, 'What are they?' What did you answer? A. I told him what they were. I said, 'There is a $30,000 item, a $10,000 item;' I said, 'There is interest on the Utah investment balances;' I said, 'God knows how many you haven't given me credit for.' Q. What did he say? A. He says, 'There is a lot of things got to be settled up;' I says, 'There sure is.' Q. When was that? A. As I recall, the latter part of May or first of June, 1921. Q. Did you ever at any other time assert any claim upon these two items prior to February 6, 1923? A. I recall, immediately after I had the conversation with Mr. Sowles, I walked up and had a conversation with Mr. Howard. I went in to him, went to the directors' room. I said, in substance, 'Did you people assume the full assets and liabilities of McCornick & Co.?' He says, 'Mr. Woolley, any obligations due you by McCornick & Co., Walker Bros. will fully protect and see that you are properly taken care of.' I said, 'Upon your word of honor?' He said, 'Don't disturb anything. Let's get all this settlement made.' Q. Did you mention the $10,000 in farmers' notes? A. That ten thousand was on the list. I read the list to Howard. He said, 'This whole general settlement will have to be made.' Q. Did you ever mention it to any one else at any other time prior to February 6, 1923? A. I don't recall that I had very much discussion about it. Q. Never wrote a letter demanding this credit? A. I wrote a letter of which I have not been able to place my hands on a copy, to Walker Bros., and demanded a full accounting from McCornicks. Q. When was that letter written? A. Some time during the summer of 1921, I think Mr. Holman dictated; he dictated the outline of that letter. Q. In that letter you demanded a full and complete accounting between Walker Bros., Bankers, for all accounts and transactions between McCornick & Co. and Ernest R. Woolley and the Utah Investment corporation? A. The letter was a general letter, stating I would hold them responsible for any and all obligations of McCornick & Co. I haven't been able to locate the letter; I have been trying very hard to. Q. When was that letter written? A. As I recall it, immediately after or about the time of my Howard conversation in confirming our conversation. Q. Did that audit (referring to an audit by Mr. Swan) disclose that McCornick & Co. owed you $10,000 in farmers' notes? A. Mr. Swan so reported to me; yes, sir. Q. You are entitled to a credit for $10,000 in cash on your account for the farmers' notes? ·A. I was. Q. You got no credits for these items that are in dispute today? A. I received no credit yet, I have stated. Q. You allege that Mr. Swan, with your permission, turned over to Mr. Melvin Sowles for McCornick & Co., Bankers, $10,000 in farmers' notes? A. Yes, sir; to McCornick & Co., Bankers, and we have McCornick & Co's receipt for that amount. Q. And the condition of it, your under-

standing was that you were to receive credit in cash for $10,000 to your account? A. I was to receive $10,000. Q. I want you to mention any single, specific instance when you made a deposit with Mr. Sowles to be entered as an additional credit to your account or account of the Utah Investment Company with McCornick & Co. A. As I recall, he took notes a number of times, but to specify instances, I could not give the date, but I know a number of occasions he took notes as credit. Q. You recall whether such unusual incident as you have told about here when you deposited $10,000 in farmers' notes and this Stockgrowers' notes with Mr. Sowles which you had in your office? A. I didn't deposit any $10,000 in farmers' notes. Mr. Sowles solicited those, and I told him if he wanted he could have them. Q. I am just saying he solicited them, but he did deposit them? A. They were turned over to McCornick & Co. Q. To be credited to your account? A. That is what Mr. Sowles stated. Q. As you understood it, you had no right, after Sowles got these notes, to go to him or go to the bank and demand them back? A. No; the notes, when they were received, were McCornick & Co.'s notes. I was to receive credit for them. Q. Title passed to McCornick & Co.? A. When they gave a receipt, title passed to McCornick & Co. Q. And McCornick & Co. became the owners of the notes? A. Absolutely. Q. And could do what they pleased with them? A. That is my understanding. Q. Could burn them up if they wanted? A. That is their business. Q. It made no difference to you? A. I made no claim on the notes."

There is considerable other evidence of the witness E. R. Woolley to the same effect as that above quoted, but the above illustrates clearly the claim made by the witness. The evidence also shows without conflict that the witness E. R. Woolley assigned his claims to the plaintiff in this action. The evidence also shows that prior to the commencement of this action a similar action had been commenced against the defendants herein upon the same items as those sued upon by the plaintiff in this action; the other action being brought in the name of E. R. Woolley. The evidence also shows that Douglas A. Swan, who was in the employ of E. R. Woolley and under the direction of E. R. Woolley, on March 16, 1921, delivered to Melvin H. Sowles the $10,000 face value of promissory notes involved in this action and set out in the plaintiff's first two causes of action, and received the following receipt, duly signed by M. H. Sowles:

"Salt Lake City, Utah. 3-16-1921.

"Received from D. A. Swan, 10,000 par of sundry farmers' notes.

"McCornick & Company.
"By M. H. Sowles."

—to which was attached a list of 43 notes, headed "notes delivered to McCornick & Co. by Mr. E. R. Woolley, March 16, 1921."

The evidence further shows without conflict that, while E. R. Woolley was absent from the office, M. H. Sowles called at his office and informed Douglas A. Swan, who at that time was in the employ of Woolley, that he (Sowles) had come to get somes notes, and that—

"Ernest told you (meaning D. A. Swan) to give us some more notes, and that this is a matter of importance. It is part of Ernest's financial arrangement. He promised them to us, and we have obligated ourselves to deliver them, and it is a matter of great importance. You let us have them, and we will see that you are protected."

Mr. Swan then said:

"Upon your assurance that this is part of Ernest's financial arrangement and that it would be embarrassing to him and yourselves if I did not, I will deliver the notes to you. I will try and get them together this afternoon or tomorrow. You get $10,000. But I expect the bank to see that I am protected, or I might have said, 'I expect you to see that I am protected.' And he (Sowles) said, 'Well, all right, I will appreciate it, and it is to Ernest's interest.' "

The evidence further shows that the notes were delivered to M. H. Sowles at McCornick & Co. bank soon after the above conversation by Lawrence Swan, a brother of D. A. Swan, and that Sowles signed the receipt hereinbefore set out. The evidence further shows that E. R. Woolley did not indorse the notes, but it fails to show that an indorsement was necessary to pass title, and does not show whether or not the notes were made payable to bearer or whether the

payee, if any, mentioned in the notes had indorsed them when they were delivered to Sowles. There were other witnesses called, and other evidence offered on the part of the plaintiff in support of his allegations contained in the complaint, but it will not be necessary to consider this evidence in passing upon the question of whether or not the trial court committed error in granting the judgment of nonsuit on the first two causes of action set out in plaintiff's complaint.

The defendants contend in their brief that the judgment of nonsuit was proper for two reasons, viz.: First, that the evidence does not support the allegations of plaintiff's complaint and that the same is so uncertain that it cannot be determined whether the $10,000 in farmers' notes was a loan of notes, a deposit for safe-keeping, a deposit as security, a deposit as money, a bailment, a pledge, a payment, or a gift; second, that, under the circumstances testified to by the witness E. R. Woolley, the transaction was ultra vires and not binding upon the defendant.

As to the first contention of defendants in this action, it seems clear that the only reasonable construction that can be placed upon the evidence of E. R. Woolley is to the effect that the notes in question were delivered to Melvin H. Sowles as an officer of the defendant McCornick & Co., Bankers, for the purpose of either securing a credit upon the account of E. R. Woolley with McCornick & Co., Bankers, or as security for the payment of the obligations which E. R. Woolley owed to McCornick & Co., Bankers. It is true that, from the conversations testified to by the witness E. R. Woolley, it does not clearly appear that there was any definite agreement that E. R. Woolley should be given a cash credit for the face value of the notes upon his account; yet it does appear that the witness E. R. Woolley so understood the transaction; but whether this understanding was the result of what was said at the time the transaction was had, or whether it was an assumption on the part of Woolley, is

not entirely clear. As will be observed from the evidence above quoted, Woolley at times stated that the notes were delivered as security, and at other times he stated that Sowles stated to him that he was to receive credit for the notes. In either event, however, it is quite obvious, from the conversation, that the transaction was in no sense a gift, and the only fair inference that can be drawn from the evidence is to the effect that Woolley was to receive some sort of credit for either the notes, or, if collected by McCornick & Co., for the proceeds therefrom. There is no dispute, in so far as the evidence discloses, but that a demand was made upon McCornick & Co. for credit. Neither is there any dispute but that McCornick & Co. has refused to give credit, to return the notes, or render any accounting whatsoever for the notes thus received. The nonsuit seems to have been granted wholly upon the ground that the evidence did not show that there was any agreement between Woolley and Sowles to the effect that Woolley should receive a cash credit upon his account with McCornick & Co., Bankers. An examination of plaintiff's complaint, filed in this action, shows that the plaintiff has pleaded sufficient facts to sustain a judgment, either upon the theory of the sale and delivery of the notes in question for an agreed consideration, or for an accounting on the part of McCornick & Co. for the notes delivered to it, or the proceeds, if any, derived from the collection of said notes. If one sells goods, wares, and merchandise to another, at the special instance and request of the other, and nothing is said about the price to be paid, the law implies that the buyer agrees to pay a reasonable price. Why should not the same rule apply to the sale of notes? We believe it should and does. The trial court seems to have granted the judgment of nonsuit because of the failure of the parties to agree and state in words that the plaintiff should be given credit for a specified amount upon his account with McCornick & Co., Bankers. Whenever property is sold, or services rendered upon request, the law assumes that the person making the request impliedly agrees to pay

therefor, unless there is something tending to show the contrary. In this case all of the evidence tends to show that the notes were delivered either for credit or as security to pay the bank the money owing it by Woolley. Indeed in this case the witness Woolley did testify on cross-examination that Sowles told Woolley that he was to receive credit on his account with the bank, and Woolley repeatedly stated that he so understood the transaction.

But, even if it should be conceded that the evidence was insufficient to support a judgment upon an express contract for the sale of the notes, the fact still remains that the notes were delivered to Sowles for the bank at the request of Sowles, and that the bank has not accounted to Woolley for the notes, or the proceeds, if any, derived from their collection although demand has been made upon the bank to do so. Plaintiff's complaint sets out these facts, and states a cause of action for an accounting.

It may be contended that a construction of the complaint such as above indicated offends against the rule of duplicity in a pleading. It is true that the complaint was amended over defendant's objection and exception at the conclusion of plaintiff's evidence, by adding at the end ■ of paragraph 3, as set out in the first cause of action, the words within parenthesis "and deposit said sum to his account," and likewise to add to the fourth paragraph of the first cause of action the words within parenthesis, "or to credit or deposit the said sum to his account." The complaint as thus amended was not further attacked in the trial court, and no assignment of error has been filed in this court, wherein it is claimed the trial court abused its discretion in permitting the amendment. The evidence ■ must therefore be considered as it relates to the complaint, as thus amended. The fact that a complaint may state a cause of action upon two or more different theories cannot be taken advantage of after a judgment is rendered. The law is well settled, both at common law and under the

Codes, that duplicity is a formal defect, and, if the adversary does not move at the proper time, he cannot object later in the proceeding. *Std. Enc. Pro.*, vol. 7, p. 947; *Johnson* v. *Meaghr*, 14 Utah, 426, 47 P. 861.

It is further contended by defendants that the transaction had by Sowles with the witness Woolley was ultra vires in so far as said transaction affected the defendant Mc-Cornick & Co., Bankers. This contention is in part ■ based upon the fact that a part of the transaction was had in the office of E. R. Woolley in the Newhouse building. Defendants rely upon the provisions of section 1005, Comp. Laws Utah 1917, which provides as follows:

"The business of every banking institution shall be conducted only at its banking house, and no bank in this state, or any loan, trust, or guaranty company or trust company conducting a banking business, or any officer, director, or agent thereof, shall open, establish, or maintain any branch bank or office, and shall receive deposits and pay checks only at its banking house; provided, that all branch banks or offices in operation at the time of the approval of this chapter shall be closed and discontinued within one year from the date this chapter goes into effect.

"Any bank or officer thereof violating any of the provisions of this section is guilty of a misdemeanor."

It will be observed from the foregoing provisions of the statute that any bank or officer thereof who violates any of the provisions of this section shall be guilty of a misdemeanor, but there is nothing in the statute that in any way makes the person who does business with the bank or its officer guilty of any wrongdoing. It would indeed be a very harsh rule of law that would make a person doing business with a bank under these circumstances punishable to the extent that he would forfeit his rights to a deposit made with a bank under these circumstances, when the statute itself in no way prevents him from doing business under such circumstances. Counsel have cited no authorities in support of this contention, and doubtless none can be found. In this connection it is further to be observed that the notes,

under the evidence, were actually delivered at the bank of McCornick & Co., Bankers, and not in the office of E. R. Woolley.

It is also contended by the defendants that the bank had no authority to enter into a contract whereby it would give credit as a cash deposit for notes and rely upon the provisions of section 981 Comp. Laws Utah 1917, which provides as folows:

> "*Commercial Bank Defined.* The term commercial bank, when used in this chapter, means any bank authorized by law to receive deposits of money, deal in commercial paper, or to make loans thereon, and to lend money on real or personal property, and to discount bills, notes, or other commercial paper, and to buy and sell securities, gold and silver bullion or foreign currency or bills of exchange.

It is true that there are cases in which the power of a bank to buy promissory notes has been denied, upon the theory that this is not included within the power to discount, as in the case of a discount the compensation to be paid for the service is fixed by law, while a bank purchasing a note can pay what it pleases; but it has been frequently held that a bank has power to buy a promissory note. 7 C. J. 598.

Under the provision of the statute above quoted, it would seem clear that the intention of the legislature, in using the words "deal in commercial paper," had in mind that a bank such as the one in question had the right to buy and sell commercial paper, and indeed counsel for the defendant, in their brief seem to concede that a bank has such a right, but apparently draw the distinction between the purchase of commercial paper and the receiving of commercial paper as a cash deposit. The distinction, however, is one of form rather than of substance. If a bank has power to purchase commercial paper and pay to the seller the cash in hand, it is difficult to conceive why a bank may not give a seller credit upon his account for the price agreed to be paid rather than actually deliver the money over to the seller and then

in turn the seller of the note delivering the money back to the bank for deposit. It would seem, therefore, that both upon principle and under the authorities the transaction here relied upon by the plaintiff for a ground of recovery was within the corporate power of the defendant McCornick & Co., Bankers.

Counsel for defendants cite in support of their contention, that the alleged contract of purchase of the notes is ultra vires, the following cases: *Tracy Loan & Trust Co.* v. *Merchants' Bank,* 50 Utah, 196, 167 P. 353; *Anglo-California Trust Co.* v. *Hall,* 61 Utah, 223, 211 P. 991; *Neil* v. *Utah Wholesale Grocery Co.,* 61 Utah, 22, 210 P. 201.

The first case cited *(Tracy Loan & Trust Co.* v. *Merchants' Bank)* holds that a bank cannot become a guarantor for the payment of rent when the bank has no interest in the transaction. The case of *Neil* v. *Utah Wholesale Grocery Co.* holds that a contract for the sale of sugar to a wholesale dealer, who had no license from the Food Administrator authorizing him to engage in the business of selling sugar as a wholesale merchant, as required by Act of Congress and the President's proclamation during the World War, is void and unenforceable; and the other case cited has no application to the facts in this case.

It is also argued by defendants' attorneys that the notes were not indorsed by Woolley as shown by the evidence, and that the evidence does not show that the notes were interest bearing. From all that appears, the notes did not need the indorsement of Woolley. If they were payable to bearer, or the last indorsement was a blank indorsement, McCornick & Co. would get good title by delivery, and Woolley would himself be liable the same as if he had indorsed the notes without recourse. Section 4098, Comp. Laws Utah 1917. At any event, if there is any presumption to be drawn from the fact that Woolley did not indorse the notes, it is to the effect that his failure to so indorse was entirely satisfactory to M. H. Sowles. The fact

that the evidence fails to show that the notes were interest bearing cannot affect the merits of a motion for a nonsuit.

It is further contended by the attorneys for the defendants that the nonsuit was properly granted for the reason that, at the time plaintiff rested, there was no evidence of the value of the notes in question. The law is settled that—

"The measure of damages for the conversion of promissory notes, bonds, and other evidence of indebtedness is their actual value, not their face value. But in the absence of proof of the actual value they will be deemed to be worth their face value, or such sum as plaintiff might have recovered on them." 38 Cyc. p. 2097.

Certainly there is no inference that all of the 34 notes delivered by the plaintiff's assignor to McCornick & Co. were valueless.

The defendants also contend that there is no evidence showing, or tending to show, that M. H. Sowles had any authority to bind the bank in a transaction such as was testified to by the witness Woolley. It is true that the evidence showed that M. H. Sowles was vice president of McCornick & Co. at the time of the transaction, and it may well be that the authority of a vice president generally does not extend to the making of such transactions as the one here involved. In this case, however, the evidence shows that M. H. Sowles was in active charge of the bank, and that the witness Woolley had had a considerable number of transactions with the bank through Mr. Sowles by way of a general banking business, and that some of these transactions were very similar to the transaction involved in this action. It would seem therefore, that, under the evidence offered by the plaintiff, M. H. Sowles had apparent authority to engage in the transaction here involved, and to bind the bank in such transaction, and that the witness Woolley was jutsified in relying upon such apparent authority in entering into a contract with the bank through M. H. Sowles.

Without reviewing the evidence at any greater length, we find in this case that there is evidence supporting the material allegations of plaintiff's complaint, and that there was such evidence supporting plaintiff's complaint as to the first and second causes of action therein alleged at the time the motion for a nonsuit was made by defendants, and that the court was in error in granting the motion for a nonsuit and entering judgment thereon dismissing plaintiff's first and second causes of action, as the same affected the defendant McCornick & Co., Bankers.

This case presents a different situation as it affects the defendant Walker Bros., Bankers. An examination of the first two causes of action, as set out in plaintiff's complaint, shows that plaintiff relies upon two grounds for holding Walker Bros., Bankers, responsible for the obligation; namely, that the defendant Walker Bros. assumed the obligation, and also that Walker Bros. are estopped from denying its liability for the payment of this claim.

The evidence shows that on May 18, 1920, Walker Bros., Bankers, took charge of the banking business of McCornick & Co., and that soon after the bank opened on that day Ernest R. Woolley came to the place theretofore occupied by McCornick & Co. and saw posted on the door the following notice: "The assets and liabilities of this bank have this day been taken over by Walker Bros., Bankers." It further appears that the depositors of McCornick & Co., including Ernest R. Woolley, received through the United States mails, in an envelope made returnable to Walker Bros., Bankers, the following communications:

"McCornick & Co., Bankers.
"Salt Lake City, Utah, May 18, 1921.

"To Our Customers: Effective today, the business of this bank has been purchased by Walker Bros. Bankers, which institution has acquired all the assets, including good will, and agrees to pay all depositors of McCornick & Co., Bankers. All checks on balances with McCornick & Co., Bankers, will be honored by Walker Bros., Bankers,

and all money due will be payable at Walker Bros., Bankers. The business of both institutions will hereafter be transacted in the Walker Bank located at Main and Second South streets.

"We wish to thank our customers, many of whom have been our friends since the early days of the bank's history, for their loyal support, and to urge them to continue their business with the Walker Bank, believing that their interests will be well served.

"McCornick & Co., Bankers."

"Walker Bros., Bankers.

"Salt Lake City, Utah, May 18, 1921.

"To the Customers of McCornick & Co., Bankers: Having purchased the business of McCornick & Co., Bankers, which will be merged with this institution, we assure you that every effort will be made to serve your interests to the best of our ability.

"All checks on balances with McCornick & Co., Bankers, will be paid by us, and all money due them should be paid to us. You may continue to use your McCornick bank books and checks until the work of transferring all accounts to the name of Walker Bros., Bankers, can be completed.

"We sincerely trust that you will continue your business with us, and will do everything in our power to merit your patronage.

"Walker Bros., Bankers."

In this connection the plaintiff offered to show that E. R. Woolley relied on these representations, but, upon objection by the attorneys for the defendant, the court refused to admit this evidence. In this respect the trial court was in error. Where an estoppel is relied upon one of the necessary elements that must be shown is that the person claiming an estoppel must show that he relied upon the acts which he claims constitute an estoppel. The law is thus stated in 21 C. J. at p. 1126:

"It is an essential element of equitable estoppel that the person invoking it has been influenced by and has relied on the representations or conduct of the person sought to be estopped."

Indeed the law could not well be otherwise, because, if a person does not rely upon the representations or conduct of another, he is not, and cannot be, injured by such representations or conduct, and therefore has no grounds of complaint.

The witness Woolley was asked the following question: "Did you take any action through the courts or with the bank comissioner or at all to protect your interests after you had read and copied this notice?" To this question an objection was made and sustained and an exception duly taken. We are of the opinion that this question was proper, as it may tend to show that Woolley either did or omitted to do something to his prejudice in reliance upon the notice which was posted on the door and the communications which he received through the mails. If, therefore, it should appear that the assignor of plaintiff did rely upon the acts and conduct of the officers of the Walker Bank, and if it further appears that plaintiff's assignor acted upon such acts and conduct to his prejudice, then and in that case the plaintiff would have a cause of action against Walker Bros., the same as he would have against McCornick & Co., Bankers. It therefore follows that the trial court was in error in granting the motion for a nonsuit and judgment of dismissal as to the first two causes of action, as the same affected the defendant Walker Bros., Bankers.

At the conclusion of plaintiff's evidence, and upon plaintiff's motion, this action was dismissed as to the defendants Assets Realization Company, a corporation, and Securities Realization Company, a corporation, and therefore we are not called upon to consider this cause as it affects these defendants.

The evidence in this case is so voluminous as it affects the third and fourth causes of action that it is impossible to state it even in substance within reasonable limits. Sufficient may be stated, however, to enable the reader to understand the questions of law involved in the assignments of error.

E. R. Woolley testified that he made a loan of $30,000 to the Stockgrowers' Bank & Trust Company of Pocatello at the request of M. H. Sowles, vice president of McCornick & Co., Bankers; that this loan was so made by Woolley upon the express agreement of M. H. Sowles that McCornick & Co. would take over the loan in a few days or soon after the 1st of the following month. Woolley further testified that he delivered the note to Sowles for McCornick & Co. and received a receipt therefor in words and figures as follows:

"Aug. 3—20.

"Rec'd for deposit credit of Woolley Stk Growers' note for $30,000 in name of McCornick & Company which loan was made for McCornick & Company by Woolley. Also copy Woolley agreement with Ogden parties on Interstate.

"MHS"

The receipt is in Woolley's handwriting, except the initials of Sowles. Woolley made no demand for credit for the amount of the note until about ten months after the note is alleged to have been delivered to McCornick & Co. The reason of the delay in making demand, as testified to by Woolley, was because he did not discover the fact that he had not received the credit for the note until he had his books audited. During the time that elapsed between the date the note is alleged to have been delivered to McCornick & Co. and the time demanded was made for credit the checking account of Woolley with McCornick & Co., as shown by its records, varied from time to time, showing the largest overdraft slightly in excess of $26,000 and the largest credit balance of slightly less than $9,000.

D. R. Pingree testified that in 1920 he was cashier of the Stockgrowers' Bank & Trust Company at Pocatello, Idaho, and had been such cashier for a number of years prior thereto; that in the latter part of 1920 he came to Salt Lake City for the purpose of either collecting the money owing upon a $30,000 note executed by the Hooper Sugar

Company in favor of the Stockgrowers' Bank & Trust Company, or, in the event the collection could not be made, then he wished to borrow for the Stockgrowers' Bank & Trust Company the sum of $30,000 and give the Hooper Sugar Company note as collateral security; that he went to M. H. Sowles, the vice president of McCornick & Co., for the purpose of securing the loan, and that Sowles stated that the bank could not make the loan until after the 1st of the following month, but that, if Pingree would see E. R. Woolley, he might secure the money, and the bank would take care of the loan after the 1st of the month. He further testified that he then went to the office of E. R. Woolley and informed the latter of his conversation with Sowles; that Woolley then called Sowles on the telephone and Sowles confirmed the arrangement for taking over the loan. Both E. R. Woolley and D. R. Pingree testified that in October, 1920, while at Pocatello, Sowles asked D. R. Pingree for additional security for the $30,000 note owing by the Stockgrowers' Bank & Trust Company.

M. H. Sowles was called as a witness by the defendants. He denied that he, for McCornick & Co. or otherwise, ever had any conversation with either E. R. Woolley or D. R. Pingree about a loan of $30,000 or any other amount to the Stockgrowers' Bank & Trust Company. He also testified that he did not know anything about the loan until many months after the loan was made. He denied that he ever talked to either E. R. Woolley or D. R. Pingree at Pocatello, or elsewhere, about security for the note in question. He denied that he gave a receipt for the note, but admitted that the initials in the receipt were probably written by him, but that, when the same were so written, the receipt was not on the paper. He further testified that it was his practice to put his initials on documents that were presented to him for his approval, but that he did not sign documents for himself or the bank by merely using his initials. It is the defendants' contention that Woolley received the paper that had been thus initialed by Sowles, and that some space had

been left between the writing or printing on the document and the initials of Sowles; that the written or printed matter had been torn off and the receipt written above the initials of Sowles. The upper edge of the paper upon which the receipt is written is somewhat jagged.

Frank Pingree was called as a witness for defendants, and testified that during the year 1920 he was cashier of the National City Bank of Salt Lake City; that the National City Bank was the correspondent bank of the Stockgrowers' Bank & Trust Company of Pocatello; that on or about July 30, 1920, he received from D. R. Pingree a letter containing the following:

"I am inclosing herewith note of the Hooper Sugar Company for $30,000 and also note signed in blank. I will instruct Mr. Ernest R. Woolley to go over tomorrow and see you regarding same. He is to let me know whether he will pay the note or advance some money on it. Would ask that you kindly acknowledge receipt and let me hear from you by telephone regarding this matter."

The note referred to as being signed in blank was not filled out, and was signed by the Stockgrowers' Bank & Trust Company, by D. R. Pingree, cashier. The corporate seal of the Stockgrowers' Bank & Trust Company 'was impressed on the note. Frank Pingree further testified that soon after the letter and notes were received he went to the office of Woolley and there showed him the letter and notes. Woolley stated that he would not advance any money on the notes until a deal was consummated for the purchase of the Hooper and Pingree Sugar Companies; that on July 30, 1920, Woolley informed him (Frank Pingree) that the transaction could be completed, and thereupon he took the notes to Woolley's office, where, at Woolley's suggestion, he (Pingree) filled out the blank note of the Stockgrowers' Bank & Trust Company for $30,000 and made it payable to Mc-Cornick & Co. The note thus filled out and the Hooper Sugar Company note were left with Woolley, and Woolley gave to Frank Pingree a check for the sum of $30,000, which

check was signed by the Interstate Investment Company, by E. R. Woolley, its president.

Gibson A. Marr, an attorney at law, residing at Salt Lake City, testified that on February 20, 1920, the witness D. R. Pingree stated that Woolley agreed that he would either buy the Hooper note or loan the Stockgrowers' Bank on its note secured by the Hooper Sugar Company note, and that the entire conversation about securing the money was had between D. R. Pingree and E. R. Woolley, and that at no time was any conversation had by D. R. Pingree with M. H. Sowles.

George D. McClintock, an attorney at law and receiver of the Stockgrowers' Bank & Trust Company, testified that D. R. Pingree, prior to the trial, stated, while explaining certain entries in the books of the Stockgrowers' Bank, that Woolley loaned the money to the Stockgrowers' Bank & Trust Company; that neither he, D. R. Pingree, nor the Stockgrowers' Bank & Trust Company had any dealings with McCornick & Co. directly, but that he (Pingree) understood that Woolley was borrowing the money from McCornick & Co. Some of the books and records of the Stockgrowers' Bank & Trust Company were received in evidence which showed that the Stockgrowers' Bank & Trust Company owed Ernest R. Woolley $30,000 on the note. It also appears that the Stockgrowers' Bank & Trust Company was closed because of its inability to meet its obligations, and the note in question is valueless. It is contended by the defendants, and there is evidence tending to show, that the note was left at the McCornick bank by Woolley with other private papers of Woolley, and the evidence also shows that the records of McCornick & Co. do not contain any reference to the note in question.

A great number of defendants' assignments of error have to do with the latitude allowed by the trial court in the cross-examination of plaintiff's witnesses. During the cross-examination of E. R. Woolley, over

timely and proper objections and exceptions of the attorneys for the plaintiff, the witness was required to answer the following questions:

"Q. Don't you know that you claimed you held a receipt from Parley Glover, and that Parley Glover told you and told Mr. Rogers and Mr. Morton that you had gone to him and had what purported to be a notice of a directors' meeting and asked him to sign his name and acknowledge the service of that notice, and that you asked him to sign his name near the bottom so as to leave room for other signatures, and that he did that, and that you later wrote above his signature a receipt?"

"Q. Did you not at one time, shortly before Mr. W. S. McCornick's death go to him with two papers, one a proxy authorizing you to vote his stock in a corporation in which he was a stockholder, and ask him to sign the proxy, and, when he had done so, didn't you ask him to also sign a copy, and didn't you afterwards appear with a purported copy with a release written thereon bearing Mr. McCornick's signature?"

These rulings of the trial court are assigned as error. The answers to each of these questions was in the negative. The answers given therefore could not prejudice the plaintiff. If there were any inference in the questions that the witness had been guilty of misconduct in the respects inquired about, such inference was certainly not augmented by the answers given by the witness. After the questions were once asked, the witness was clearly not discredited by reason of the answers given. The witness Woolley seems to have been willing to answer the questions, and the defendants were bound by the answers.

Complaint is also made of the trial court's ruling, over timely and proper objection, in admitting in evidence the files in another case brought by the witness E. R. Woolley against Walker Bros., et al., wherein a receipt appears to have been relied upon as evidence of a transaction in no way connected with the issues in the case being tried. We are of the opinion that the trial court was in error in admitting this evidence. It was later made to appear from

the evidence that the defendants acknowledged in part at least the contentions made by the plaintiff in said action. The admission of this evidence cannot be said to be prejudicial to the plaintiff herein. The giving of receipts is such a common practice, and people so frequently rely upon receipts as evidence, that no adverse inference should or could be drawn from the fact that in another action, entirely foreign to the action being tried, a receipt was in part relied upon as evidence.

Complaint is made by appellant of other questions asked the witness Woolley on cross-examination, but these other assignments in this connection are without merit.

Assignments numbered 18, 19, 20, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, and 34, refer to alleged errors in requiring D. R. Pingree, one of plaintiff's witnesses, to answer questions on cross-examination. On direct examination, Pingree had testified as to the entire transaction had in connection with the making of the loan to the Stockgrowers' Bank & Trust Company, and also that while at Pocatello, at the time the Stockgrowers' Bank & Trust Company closed its doors, Sowles asked for more security for the $30,000 note. On cross-examination, the trial court permitted the attorneys for the defendants, over timely and proper objection, to examine the witness D. R. Pingree at great length upon what transpired at Pocatello, and also what the books of the Stockgrowers' Bank & Trust Company showed in connection with this transaction. We are of opinion that the cross-examination was proper. The whole transaction was opened by the plaintiff on direct examination, and the defendants were entitled to cross-examine Pingree as to all phases of the transaction, including the entries made by Pingree in the books and records of the Stockgrowers' Bank & Trust Company, as well as the purposes, nature, and extent of Sowles' business with the witness Pingree at Pocatello. Special complaint is made in the assignments of error that Pingree was examined about entries

made in the books of the Stockgrowers' Bank & Trust Company by the assistant cashier. It is true that the entries in the books of the Stockgrowers' Bank & Trust Company are not binding upon the plaintiff, and could not have been admitted as original evidence against the plaintiff. It is likewise true that, unless Pingree can be said to have known of such entries and acquiesced in the same, he cannot properly be impeached in this manner. A witness, however, may be impeached as well by entries in books inconsistent with the evidence given in chief as he may be by other statements made or acquiesced in which are inconsistent with his evidence given in court. In this case it is made to appear that D. R. Pingree was in charge of the bank; that he transacted the business of securing the $30,000 loan; that he made an entry in the minute book of the Stockgrowers' Bank & Trust Company as to the disposition of the $30,000 Hooper Sugar Company note given to secure the note involved in this action. He further testified that he made the minute entry showing that the Hooper Sugar Company note was sold to McCornick & Co., with recourse, for the purpose of making as good a showing as possible to his board of directors. If the evidence of the witness McClintock is to be believed, D. R. Pingree made an explanation to McClintock of the purpose and nature of all of the book entries which were received in evidence. On cross-examination, D. R. Pingree was asked these questions and gave these answers:

"Q. About October 9, 1920, you caused an entry to be made on your books, in bills payable, showing the note for $30,000 to Ernest R. Woolley, didn't you? A. There was one made, but I don't know whether I caused it to be made, but that is the way the entries on the books show. Q. That is the understanding you had up there, wasn't it, at that time? A. It must have been."

We are of the opinion that the admission of the book entry of the Stockgrowers' Bank & Trust Company, wherein it appears that the $30,000 note was owing to Ernest R. Woolley, was, on the record in this case, proper as tending to explain, modify, or impeach the evidence

given by the witness D. R. Pingree, and in any event the evidence was not prejudicial, as D. R. Pingree had, without objection, testified to the same facts as those contained in the book entries.

It is further claimed that some of the questions asked were intended to, and did, elicit answers foreign to the issues, but, even so, the questions and answers ■ were harmless, and might properly be allowed, as tending to test the recollection of the witness. *Wigmore, Evidence* (2d Ed.) vol. 2, § 995, p. 425.

Cross-examination is largely in the discretion of the trial court, and we are of the opinion that the trial court did not abuse its discretion with respect to the cross-examination of the witness D. R. Pingree.

Assignments of error Nos. 21, 22, and 23 affect the question of the trial court in limiting the redirect examination of the witness Pingree. An examination of the record reveals the fact that the matters inquired about in ■ the questions propounded were in effect either answered in other questions, or the information sought to be elicited was so remote as to have but little, if any, bearing on the matters in issue.

Complaint is also made of the trial court's ruling in permitting the witness Sowles to answer, over timely and proper objection, questions on direct examination, wherein he gave his version of his trip to Pocatello in October, 1920, and of what transpired at Pocatello, and also to ■ testify that he (Sowles) did not have any conversation with any of the officers or employees of McCornick & Co. about going to Pocatello to secure additional security on the note of the Stockgrowers' Bank & Trust Company. Defendants were of course entitled to rebut any inference that Sowles had gone to Pocatello for security for the note of the Stockgrowers' Bank & Trust Company, and the substance of this evidence is merely to that effect.

Complaint is also made of the examination of Farnsworth and Howard, officers of Walker Bros., Bankers, as to various conversations had with E. R. Woolley. The complaint is based upon the theory that the evidence offered by these witnesses was not impeachment, and that no proper foundation was laid for impeachment. The amended answer of both McCornick & Co. and Walker Bros. sets up the defense of estoppel and an account stated. As tending to establish these affirmative defenses, the defendants were entitled to go into various transactions had with Woolley affecting these issues, without regard to the question of impeachment, and we are of the opinion that no error was committed in this respect.

We have carefully considered all the assignments of error, in so far as they affect the findings of fact to the effect that McCornick & Co. did not agree to take over the loan of $30,000 to the Stockgrowers' Bank & Trust Company, and we find no prejudicial error as it affects this issue. We are of the opinion, and so hold, that the evidence in this case amply supports the trial court's findings upon this issue.

Counsel in their respective briefs have argued at some length the question of whether or not the written contract entered into between McCornick & Co., Bankers, Walker Bros., Bankers, and others, does or does not make Walker Bros., Bankers, liable for the payment of all the obligations of McCornick & Co., Bankers. Neither the plaintiff nor his assignor were in any way parties to this agreement, and therefore are not bound thereby. It will be observed from the pleadings which we have set out at the beginning of this opinion that the plaintiff relies upon certain representations and conduct of Walker Bros. as constituting an estoppel of Walker Bros. from denying its liability to pay the claim sued upon in this action, and likewise the defendants in their amendment to their answer rely in part at least upon the representations and conduct of E. R. Woolley, plaintiff's

assignor, as constituting an estoppel on the part of the plaintiff from asserting any liability, either against McCornick & Co. or Walker Bros., upon the claims involved in this action. It will be observed, therefore, that the contract whereby Walker Bros. took over the McCornick bank is only one of the matters to be considered in determining the question of ultimate liability, or lack of liability, on the part of Walker Bros., Bankers, and has no effect upon the question of liability on the part of McCornick & Co., Bankers. We believe it would serve no good purpose for this court to construe this contract, when such construction would not determine the result of this action in the event that, upon a retrial, it shall be found that McCornick & Co. are primarily liable. The contract in question does not necessarily fix the liability, or lack of liability, of Walker Bros., and indeed it may be found to be immaterial. If the plaintiff is able to establish facts sufficient to constitute an estoppel of Walker Bros. by reason of their actions and representations, it of course would be liable, regardless of the terms of the contract, and likewise, if the evidence shall establish facts showing that Woolley, by his actions and representations, is estopped from making any claim against McCornick & Co. and Walker Bros., then his assignee, the plaintiff in this action, would likewise be estopped, and the effect of the contract above mentioned would become immaterial. We believe the ultimate result should be determined when all the facts are before the court, and that a determination of this cause should not be made by piecemeal. For these reasons we do not express an opinion upon the effect of the contract in question, but hold that the trial court should make a complete finding upon all of the issues in this cause, and then determine the law applicable to the facts thus determined. We therefore do not approve the trial court's finding that, under the contract in question, Walker Bros. did not assume the liabilities of McCornick & Co. upon the claims here in issue.

From what has been said, it follows that the judgment of nonsuit, dismissing plaintiff's first two causes of action, should be, and the same is reversed, and the said two causes of action are remanded to the trial court for a new trial, and that the judgment of the trial court as to the third and fourth causes of action is affirmed. Such is the order. Appellants and respondents are each to pay one-half of the total costs of appeal.

THURMAN, C. J., and CHERRY, J., concur.

FRICK, J. I concur in the reversal of the judgment on the first and second causes of action. I do so, however, upon the sole ground that McCornick & Co. received and accepted the notes in question in those two causes of action from Mr. Woolley as collateral security, and that there is some substantial evidence that McCornick & Co. has in no way accounted for either the notes or the proceeds, if any were derived from them. I do not concur in the contention that McCornick & Co. purchased and became the owner of the notes as a purchaser thereof and is liable as such. I also concur in the affirmance of the judgment on the other causes of action.

STRAUP, J., being disqualified, did not participate herein.

HANSEN, District Judge, participated in the hearing of said cause, and pending the filing of the opinion was elected as a Justice of the Supreme Court.

The term of office of former Chief Justice GIDEON expired pending the filing of this decision.

On Application for Rehearing.

PER CURIAM. Since writing the original opinion in this cause, the plaintiff has filed a petition for a rehearing on

the third and fourth causes of action, and the defendant Walker Bros., Bankers, has filed a petition for rehearing on the first and second causes of action. We have again examined the record herein, and have made some amendments and additions to the original opinion for the purpose of more thoroughly and clearly reflecting the record. The opinion as thus amended will be the opinion in this cause, and the petitions for rehearing are denied.