# CHARLESTON. ·

J. Addison Suttle, Admr. v. Hope Natural Gas Company.

Submitted October 8, 1918.   Decided October 22, 1918.

1. Pleading—*Demurrer—Subsequent Amendment—Notice.*

   Where a demurrer to a declaration, technically defective for failure to aver plaintiff's appointment and qualification as administrator in an action brought by him as such, is erroneously overruled, and plaintiff immediately and in the presence of counsel for defendant moves for leave to amend, and leave is granted without objection, and the declaration is amended by inserting the proper averment, such voluntary amendment after demurrer overruled is not equivalent to a demurrer sustained, and under such circumstances the informal notice is sufficient.   (p. 732).

2. Commerce—*Compensation Act—Power of State—Interstate and Intrastate Commerce.*

   With respect to the employes of an employer engaged in interstate commerce, the state possesses full and exclusive power to prescribe a method of compensation for all such employes whose work is wholly intrastate and clearly separable and distinguishable from work in interstate commerce, and the state also has permissive power to prescribe a method of compensation within the field belonging primarily to Congress until the latter has exercised its superior power covering the same subject.   (p. 733).

3. Master and Servant—*Workmen's Compensation Act—Employes Engaged in Intrastate Commerce—Construction of Act.*

   With respect to an employer engaged in interstate commerce, section 52 of the Workmen's Compensation Act, chapter 15P, Code, applies the provisions of the act unconditionally to those of his employes whose work is wholly intrastate and clearly separable and distinguishable from work in interstate commerce, though the same section, with respect to employes who are engaged partly in intrastate, partly in interstate commerce, provides that the act shall apply only upon the condition that the employer and such employes voluntarily accept the provisions of the act by formal writing approved by the commissioner.   (p. 734).

4. Commerce—*Workmen's Compensation Act—Work Separable from Interstate Commerce.*

   An employe of an interstate carrier of gas assisting 'in the erection of a three-pole rig or derrick to be used in cleaning out a gas well in order to accelerate its production, and whose work then and on other occasions was wholly distinct from the transpor-

tation phase of the business, is engaged in work clearly separable and distinguishable from interstate commerce within the meaning of section 52 of the Workmen's Compensation Act, and entitled to the benefit of the provisions of that act.  (p. 738).

5.  MASTER AND SERVANT—*Master's duty—Rules and Regulations.·*

As a general rule, an employer owes to his employes the duty to promulgate and enforce reasonable rules and regulations for their guidance and protection, but in the absence of evidence showing that such rules would be useful and feasible under similar circumstances, the employer cannot· be held negligent in having failed to promulgate them. · (p. 740).

6.  TRIAL—*Instructions—Conformity to Evidence.*

And an instruction ·fixing liability upon defendant without proof sufficient to establish the necessity and feasibility of such rules and regulations, when applied to the particular work, ordinarily is erroneous and ought not to be given.  (p. 740).

7.  MASTER AND SERVANT—*Rules and Regulations—Evidence.*

The rejection or exclusion of testimony offered to show the feasibility of and necessity for the promulgation of rules and regulations for the protection of employes while engaged in the performance of dangerous work is erroneous.  (p. 740).

8.  SAME—*Instruction—Promulgation of Rules.*

An instruction imposing upon an employer the duty to promulgate and enforce rules and regulations for' the protection of its employes should prescribe with reasonable definiteness the nature of the rules sought to be required, and not leave to the jury's conjecture ·the determination of their character.  (p. 740).

Error to Circuit Court, Harrison County.

Action by J. Addison Suttle, administrator, etc., against the Hope Natural Gas Company.  Judgment for plaintiff, and defendant brings error.

*Reversed, and remanded for new trial.*

*A. B. Fleming, Charles Powell,* and *Kemble White,* for plaintiff in error.

*Steptoe & Johnson,* for defendant in error.

LYNCH, JUDGE:

Plaintiff's intestate, his son nearly sixteen years old, was killed by the fall of a· three-pole derrick which he and other employes of the defendant were engaged at the time

in erecting preparatory to and necessary for the cleaning of a gas well to accelerate its production. The derrick was formed while on or near the ground out of three stems of six inch pipe forty to fifty feet long, bound together at one end, the other ends of two of them being placed or chained at or near the sockets prepared to receive them when hoisted into the proper position and cut in the sills supporting the platform around the well, the third stem extending out in the opposite direction like the lower part of the letter "Y," and being the last one to reach and enter the socket likewise prepared, the sockets being equally distant from each other, estimated to be from fifteen to eighteen feet; and as thus formed, bound, placed and chained, the apparatus was raised into position by means of the team of horses driven by the decedent hitched to a line connected with one or more pulleys and fastened to the third stem. When it was raised almost to the position desired, defendant's foreman, Bramer, ordered Suttle to disconnect the team and return it to the derrick and reconnect with the line a second time the better to complete the hoisting process. This order the deceased obeyed and drove the team within the triangle formed by the three stems, and with the assistance of an employe had almost completed what he was told to do, during which time Bramer was engaged in "pinching" one of the stems into its socket, when the derrick fell and caused the death of the decedent while trying to escape the falling stems, but did not injure the horses, though still within the triangular space.

The declaration avers three different causes of action in nine counts, to each of which and to the declaration as a whole defendant at the May, 1917, term demurred. The causes are, the failure (1) to provide a reasonably safe place and appliances in and with which to work; (2) to warn and instruct; (3) to promulgate and enforce proper rules and regulations. At the September term the court overruled the demurrer, and, as appears from the order, plaintiff thereupon amended the pleading by adding to each count an averment of his appointment and qualification as personal representative, and later moved for an order to require defendant to plead to the amended declaration on or before October 2,

that date being within the term.  On that day defendant appeared specially and entered its protest and objection to the enforcement of the requirement to plead, basing its argument upon the ground that as it had demurred, plaintiff could not within that term amend and compel an issue upon the pleading, except upon the notice required by sec. 12, ch. 125, Code, and that no such notice was given.  The objection being overruled, defendant pleaded the general issue.

Defendant was present in court by counsel when the demurrer was overruled and the declaration amended, and therefore was advised of the action taken.  Besides, the statute cited requires notice only where a demurrer is sustained, not when it is overruled.  But defendant contends that though the order "doth now overrule the said demurrer," yet in the next line it shows a confession of insufficiency by permitting plaintiff to amend by averring his appointment and qualification, as required in *Austin* v. *Calloway*, 73 W. Va. 231, and that therefore there can be no difference in plaintiff's position where he confesses the demurrer to be good and moves to amend, and where the court holds the demurrer to be good, necessitating amendment.  In other words, defendant contends that a voluntary amendment after demurrer overruled is the same as a demurrer sustained.  There is a substantial difference, we think, between voluntarily amending a pleading and being compelled to do so on penalty of dismissal with costs after the court has adjudged it to be materially defective.  There is greater need for the formal notice in the latter case, since the demurrant has been lulled into a sense of security by the sustaining of his challenge to the declaration.  Furthermore defendant seems not to have been prejudiced by the action taken, because he was present in court by counsel at the time the amendment was offered and interposed no objection then for want of formal notice.

Nor did the court err in overruling defendant's motion for a continuance based upon the absence of Cain, one of the eye witnesses of the accident, then in the service of the United States.  Defendant introduced only two witnesses, Cooper and Quay, the purport and effect of whose testimony

was to show the interstate character of the business in which
defendant was engaged at the time of the injury, from which
it was argued that defendant's failure to pay premiums into
the state compensation fund did not deprive it of the com-
mon law defenses.  It did not call to the stand Bramer, its
foreman in charge of the work and present at the time the
injury was inflicted.  With the exception of Bramer and
Cain, the employes witnessing the accident were called by
the plaintiff to testify in his behalf and subjected to cross-
examination by the defendant's counsel.

   The next ground relied on for reversal goes to the exclu-
sion of the testimony introduced to establish the general in-
trastate and interstate character of defendant's business and
of the work being done when the derrick fell.  Thus the gas
from the well, it appears, had, immediately preceding the at-
tempt to clean the well, been transported and delivered
through trunk pipe lines, with which feed lines from the
well were connected, beyond the state line into Ohio and
there sold, together with like production from other wells
controlled and operated by defendant, to another company
for distribution to its patrons and consumers in that state,
and to the Manufacturers' Light & Heat Company at or near
Sedalia in this state, and thence by it transported to Penn-
sylvania and Ohio for like sale and distribution to its pa-
trons and consumers.  Apparently natural gas is a commodi-
ty, as much so as coal, fruits or lumber, and when trans-
ported through conduits to market becomes the subject of
interstate or intrastate commerce accordingly as the trans-
portation between the place of production and distribution
and sale is in different states or in the same state.  Just as
coal it is a fuel, and as such is used for domestic or industrial
purposes.  It is a substance marketable either within the state
wherein it is produced or in the state to which it is trans-
ported and sold.

   The ultimate object and purpose of the excluded proof
was, as indeed is conceded, to bring the case within the terms
of section 52 of the Workmen's Compensation Act, chapter
15P, Code, in order to meet the averment of one count of the
declaration regarding defendant's failure to put itself within

the protection of the act by compliance with its general provisions, which section as respects certain work relieves an employer from the unconditional requirement of compliance, so as not to exclude the right to rely on the common law defenses of fellow servancy, assumption of risk and contributory negligence.

It is unnecessary to decide, and we do not decide, whether defendant is engaged in interstate commerce or not. If it is not, clearly section 52 does not apply and the act requires unconditional compliance with its terms. But assuming, only for the purpose of this decision however, that defendant is engaged in interstate commerce, if the general work of plaintiff's intestate and his duties at the time of the injury were within the state and "clearly separable and distinguishable from interstate commerce work," the act applies unconditionally.

Section 52 was enacted to prevent conflict with the federal power over interstate commerce, and to bring within the protection of the act only such employes as to whom the state could legislate without violating congressional enactments under the commerce clause of the federal Constitution. Where the employes of an interstate carrier are concerned, the power of the state over such employes stands thus: (1) As to work done in intrastate commerce, the state has full and exclusive primary power. The first Employers' Liability Act was held unconstitutional because extended to cover *all* work done by employes of an interstate carrier, a large part of which work could not be upon interstate commerce or directly in furtherance thereof. *First Employers' Liability Cases,* 207 U. S. 463. The present liability act eliminated that difficulty, and was held constitutional in *Second Employers' Liability Cases,* 223 U. S. 1. (2) As to their work upon interstate commerce, when Congress has prescribed a method of compensation, the state has no power. *New York Cent. R. R. Co.* v. *Winfield,* 244 U. S. 147; *Erie R. R. Co.* v. *Winfield,* 244 U. S. 170. (3) As to their work done upon interstate commerce, where Congress has not prescribed a method of compensation, the state can exercise a limited right of regulation until Congress has legislated upon the subject. Thus

while Congress cannot under any circumstances, if it desired, invade the state's region of control, the state can cover the field belonging to Congress until the federal power has actually been exercised. *Minnesota Rate Cases*, 230 U. S. 352; *Valley Steamship Co.* v. *Wattawa*, 244 U. S. 202. As yet Congress has not chosen to exert its power over interstate carriers of natural or artificial gas, for the Interstate Commerce Act (8 U. S. Comp. Stat., 1916, sec. 8563, p. 9053) expressly excludes them from its terms, and the present Employers' Liability Act (8 U. S. Comp, Stat., 1916, sec. 8657, p. 9388) applies only to employes of interstate carriers by railroad.

In addition to the constitutional obstruction where the employer is engaged in whole or in part in interstate work, the framers of our Compensation Act were confronted with the practical difficulty of applying it to employes of such employer, who may, with reference to the work being done, be divided into three classes: (1) Those working wholly upon intrastate commerce or business that is clearly distinguishable and separable from the interstate work. (2) Those working wholly upon interstate commerce. (3) Those working partly upon intrastate and partly upon interstate commerce. As to the first two, no difficulty appears, for one field belongs exclusively to the state, the other primarily to Congress, and the employes of each could readily be ascertained and classified. As to the third class, however, an apparent difficulty arose. Congress could not provide for them except as to their interstate work, and has not provided for them to any extent, except as to employes of carriers by railroad. But the state under its primary power could cover all intrastate work, and under its permissive power could provide for all interstate work not covered by federal legislation.

To meet this situation section 52 was enacted. The general scope of the Act is disclosed in section 9, chapter 15P, to embrace ''all persons, firms, associations and corporations regularly employing other persons for profit, or for the purpose of carrying on any form of industry or business in this state.'' Employes are defined as ''all persons in the service of employers as herein defined, and employed by them for the pur-

pose of carrying on the industry or business in which they are engaged.''

Section 52 limits the general scope of the act, and as originally enacted in 1913 was as follows: ''The provisions of this act shall apply to employers and employes engaged in intrastate and also interstate or foreign commerce, for whom a rule of liability or method of compensation has been or may be established by the congress of the United States, only to the extent that their mutual connection with the intrastate work may and shall be clearly separable and distinguishable from interstate or foreign commerce, except that any such employer and any of his employes working only in this state may with the approval of the commission, and so far as not forbidden by any act of congress, voluntarily accept the provisions of this act by filing written acceptances with the commission, and such acceptances, when filed with and approved by the commission, shall subject the acceptors irrevocably to the provisions of the act to all intents and purposes as if they had been originally included in its terms. Payments of premium shall be on the basis of the pay roll of the employes who accept as aforesaid.''

This section embraces two parts: The first limited the application of the act, where the employer is engaged in both interstate and intrastate commerce, to cases where, and to the extent that, the intrastate work in which they are engaged is clearly separable and distinguishable from the interstate phase of the employer's business. That is to say, it limits the unconditional application of the act to the first class of employes mentioned above, those working wholly on intrastate commerce as clearly distinguished from interstate work, and excludes its application to the second class, those working wholly in interstate commerce. The second part of section 52, the exception clause, deals with the third class of employes, those working partly upon interstate and partly upon intrastate commerce. As to them the act applies only conditionally, that is, the employer and such employes must first voluntarily accept the provisions of the act by filing written acceptances with the commission for its approval, which it

may grant or withhold. *Barnett* v. *Coal & Coke Ry. Co.*, 81 W. Va. 251, 94 S. E. 150.

Though a voluntary acceptance of the provisions of the act is necessary before the protection of its terms is available to employes doing both interstate and intrastate commerce, it is not necessary where the employes are engaged in work clearly separable and distinguishable from interstate commerce. Reading section 52 down to the word "except", the effect of the section to that point is to cut down the broad terms of section 9, quoted above, where the employer is engaged in interstate commerce, and to limit the application of the act to such of his employes as are doing work clearly separable from interstate commerce, that is, to limit the act to the first class of employes mentioned above, those engaged wholly in intrastate work. If we stop at that point, classes two and three are entirely excluded from the benefits of the act. But the clause beginning with the word "except" extends the act to include those in class three named above, but makes its application conditional upon their acceptance of its terms. Hence the second part of section 52 does not restrict the first, but, as we have seen, adds to and extends it. Hence the conditional application of the act provided for in the second part of the section does not relate to or cover the first also, but leaves it unconditional. The case of *Barnett* v. *Coal & Coke Ry. Co.*, *supra*, though dealing with a situation where the employes were engaged partly in interstate, partly in intrastate commerce, and holding that as to such situation the act applied only conditionally, as we have seen, yet intimated that if the work had been clearly separable from interstate commerce the act would have applied unconditionally. The courts of several states with statutes exactly like or essentially similar to our section 52, as it originally stood, have held that where the work is clearly separable from interstate commerce the act applies unconditionally. *State* v. *Postal Telegraph Cable Co.*, (Wash.) 172 Pac. 902; *Jensen* v. *So. Pac. Co.*, 215 N. Y. 514 (reversed upon other grounds in 244 U. S. 205); *Raymond* v. *Chi., Mil. & St. Paul Ry. Co.*, 243 U. S. 43, 45; *New York Cent. Ry.* v. *White*, 243 U. S. 188, 191-2. Section 52 was amended in 1915, and as

amended was in force at the time of the injury to plaintiff's intestate. But its provisions are essentially unaltered, as defendant admits in his brief, and what has been said applies to the section as it now stands.

Hence it becomes necessary to consider whether the work which the deceased was doing was clearly separable and distinguishable from interstate commerce. Until reduced to possession by confinement, natural gas, it is said, though somewhat inaccurately, partakes of the nature of *ferae naturae.* It is not the subject of ownership till brought to the surface and confined, and of course cannot become the subject of interstate commerce till its ownership becomes complete by confinement in the ordinary, inded the only competent, mode of transportation, pipe line conduits. The well reaches down to the gas bearing strata and releases the gas there confined, but until it reaches the surface and enters the pipe for transmission to the interstate trunk lines, it is not in interstate commerce. The production department of the gas industry is clearly separable from the transporting or marketing branch. All work in connection with the production of gas, that is, with bringing it to the surface where it may be confined and reduced to possession, is local in nature and clearly separable and distinguishable from the marketing or interstate portion of the industry. The work being performed by plaintiff's intestate was confined wholly to the well itself and was separable from the transportation phase of the business, nor was his work on other occasions and at other times such as to bring him within the class of those engaged partly in interstate, partly in intrastate commerce.

The case of *Del., Lack. & West. R. R. Co.* v. *Yurkonis,* 238 U. S. 439, clearly emphasizes and illustrates the argument addressed to this branch of the case. Instead of being engaged in the devlopment and marketing of gas for profit through trunk pipe lines owned by it and extending into Ohio, the defendant in the case cited owned and operated a railroad and the coal mine in which Yurkonis, a miner, was employed and worked when injured. Reading from the opinion at page 444, we find the court saying: "The mere fact

that the coal might be or was intended to be used in the conduct of interstate commerce after the same was mined and transported did not make the injury one received by the plaintiff while he was engaged in interstate commerce." Evidently young Suttle was not performing any work directly in reducing and delivering gas into the pipe lines. The derrick was merely an instrumentality later to be employed in cleaning the well of obstructions impeding the operation of another instrumentality, the well itself, also employed to effectuate the ownership of the gas within the land, that the gas might, but had not then, become an article of commerce. This employment is, we think, too remote to be considered as in furtherance of or an element or factor in interstate commerce. Hence we are of the opinion that the Compensation Act applies unconditionally and that defendant is therefore deprived of his common law defenses.

Whether, as defendant in error argues, these defensive matters can properly be proved at the trial upon the general issue without a special plea, as intimated in *Rhodes* v. *Coal Co.*, 79 W. Va. 71, we need not determine, as what we have said renders a discussion of that question unnecessary. The only question involved as regards the present subject, the dual character of the business conducted by defendant on the date of the accident, is whether he was employed at that time in interstate commerce, that matter being significant only as a basis for the application of the peculiar provisions of section 52, chapter 15P. And since, as appears, defendant's situation rendered these provisions unconditionally operative, the pleadings have ceased to be important.

Finally we are required to express an opinion upon the appropriateness or propriety of instructions five and six propounded by plaintiff below and read to the jury over defendant's objection. The only apparent defect, if such it be, pointed out by counsel or discovered by us as to number five goes to what is said to be the equivalent of the expression of judicial opinion to the effect that the negligence of defendant's foreman in attempting to "pinch" one of the three legs of the derrick into its proper position caused the

derrick to fall, and therefore was the real or promimate cause of the injury. Whether justly amenable to that criticism, it is nearly so and perhaps ought not to have been given. Jurors are alert to perceive and often interpret the slightest authoritative intimation of opinion upon the issues they are sworn to try and determine.

Instruction No. 6, however, seems to us to be wholly erroneous. It follows: ''The court further instructs the jury that the defendant was bound to adopt, promulgate and enforce rules reasonably protecting its servants from the dangers of the service arising from neglect of fellow servants or otherwise; and if the jury believe from the evidence that the defendant neglected to adopt, promulgate and enforce such rules, and that the death of Joseph Patrick Suttle was due to such neglect, the defendant is liable in damages therefor.''

This instruction relates to the duty averred in the declaration, as to the existence of which much testimony was addressed, but none to its feasibility or adaptability to temporary three-pole derricks, to formulate and promulgate reasonable rules and regulations to govern and control the employes of the defendant in the detailed construction of such rigs at gas wells. Though averred in general terms, there is, as we said, no proof in the record tending to show in what respect rules that might be considered reasonable, practicable and applicable under varying circumstances and conditions surrounding the erection of such instrumentalities could have been formulated and promulgated by defendant. There is, as likewise observed, some proof tending to show want of the publication or posting of such rules and regulations, but none showing the necessity therefor, though it is argued that the necessity is apparent because of the hazard and peril incident to the work in which decedent when killed was engaged. The danger may be apparent with or without rules and regulations. The appearance of the danger may be obvious and patent, yet the rules and regulations may neither remove nor lessen the risk. Labatt does at sec. 1115, Master & Servant, state the proposition for which counsel contends, but he adds in the same section what seems to us

to be sound law: ''Where the necessity for and practicability of providing rules to meet the given circumstances are apparent from the averments of the complaint and from the testimony by which those averments are supported, the mere fact that neither the pleadings nor the evidence indicate exactly what rules should have been established does not render it a misdirection to charge the jury that the defendant would be liable if he did not establish rules to protect his employes. But in the absence of evidence showing that rules would be useful or feasible under the circumstances, the master cannot be held negligent in not having promulgated them.''

Counsel representing the plaintiff at the trial and in this court, conceding the force of this requirement, offered, but was not permitted to introduce, proof tending to show the feasibility of and necessity for the promulgation of rules and regulations applicable to the erection of three-pole derricks, but does not cross-assign that refusal as erroneous. This proof should have been admitted to aid the court and jury trying the case in reaching a just conclusion upon the necessity and availability of the protection likely to be afforded by such rules, if enforced. The rejection or exclusion of testimony offered to show the feasibility of and necessity for the promulgation of rules and regulations for the protection of employes while engaged in the performance of dangerous work, is erroneous, and cause for reversal upon the application of the party prejudiced thereby.

We are urged to treat the giving of instruction No. 6 as harmless, first, because the facts proved show the inherently dangerous character of the work done and justify the verdict and judgment notwithstanding the instruction, and second, because, as the error in rejecting or excluding the testimony offered to establish the feasibility of and necessity for the promulgation of rules applicable to the erection of three-pole derricks was induced by defendant, the defendant, not plaintiff, should suffer the consequences of the erroneous ruling.

In answer to the first proposition it suffices to say that for aught we know to the contrary the jury may have based its

verdict solely upon the instruction, and concluded that the death of plaintiff's intestate was due to the failure of the defendant to promulgate and publish certain rules and regulations, which it may without any proof whatever have thought would, if promulgated, have saved the life of the decedent. In answer to the second it suffices also to remark that ordinarily a defendant cannot be penalized for exercising his well recognized right to object to the introduction of any proof which he deems to be without probative force or value upon the trial of the issues joined upon the pleadings, and, if he can, to secure a ruling thereon in his favor. To punish him as suggested and treat the rejected proof as present in the record and as having been considered by the jury, when in fact it was not before them for consideration, would deprive him of the right to introduce proof to the contrary, if any be had.

But the chief objection to the instruction is its generality. It leaves to the jury to prescribe the method which, if prescribed and enforced by defendant according to their conception, would have prevented the accident and saved the life of the deceased. For that reason it falls within the condemnation of *Lawrence* v. *Hyde,* 77 W. Va. 639, 645, wherein the court, speaking through Judge POFFENBARGER, says: "Although no count of the declaration avers failure to adopt and promulgate rules for the regulation of the work and conduct of the men, and there is no proof of lack of rules, an instruction, abstract in form, declaring it to be the duty of an employer to make and enforce reasonable rules for the protection of the servants from unnecessary injury and avoidable danger, and telling the jury to find for the plaintiff, if they should believe such duty had been omitted by the defendant, was given over objection. Lack of averment and proof of failure to prescribe rules precluded right to give this instruction. * * * Moreover, it is entirely too general and indefinite in its terms, if there had been an allegation and proof of non-existence of rules. Under it the jury could have set up duty to make a rule applicable to something only remotely connected with the injury, omission of

which would not have constituted proximate cause thereof, and founded their verdict on such omission.''

For these reasons we reverse the judgment and remand the case for a new trial.