# HARRINGTON et al. v. INDUSTRIAL COMMISSION OF UTAH et al.

No. 5969.   Decided September 29, 1938.   (83 P. 2d 270.)

Rehearing denied December 19, 1938.

*A. H. Hougaard,* of Salt Lake City, for plaintiffs.

*Bagley, Judd & Ray,* of Salt Lake City, for defendants.

MOFFAT, Justice.

The parties agree that the writ of review in this case presents to this court for determination a single question. That question is: Was Benjamin Harrington, at the time he received the injury resulting in his death, engaged in an activity forming a part of a service in interstate commerce?

The Industrial Commission of the State of Utah concluded that deceased, at the time of the injury resulting in his death, was engaged in interstate commerce, and upon that finding, concluded and decided that the Industrial Commission of Utah was without jurisdiction to proceed with the cause or award compensation under the Workmen's Compensation Law of Utah, Rev. St. 1933, 42-1-1 et seq., no

matter how meritorious the claim. Without attempting to separate facts from conclusions, the Commission stated in its findings:

"I. That on February 9, 1937 and for several years prior thereto the defendant Railroad Company owned and operated a railroad extending from Salt Lake City, Utah, to Payson, Utah, and was engaged in interstate commerce and employed more than three employees and had complied with the laws of Utah pertaining to Workmen's Compensation, and the Great American Indemnity Company was the insurance carrier of said B. L. Ball as Receiver.

"II. That on February 9, 1937, and since November 1, 1936, Benjamin H. Harrington was in the employ of the defendant, B. L. Ball as Receiver of the Salt Lake and Utah Railroad Company, and was employed as a brakeman earning an average weekly wage of $19.81, working seven days per week; that on February 9, 1937 said Benjamin H. Harrington suffered an accidental injury while in the course of his employment in interstate commerce by said defendant, which resulted in his death on March 7, 1937.

"III. That at the time of said accidental injury the deceased was engaged and working as a brakeman on a train of seventeen cars operated by defendant southbound between Salt Lake City and Provo, Utah; that said train contained and included a carload of interstate freight, to-wit, a car of scrap paper billed and being transported in interstate commerce from Salt Lake City, Utah, to Kalamazoo, Michigan, and a car of poultry feed originating at Salt Lake City and billed and being transported to American Fork, where the defendant Railroad Company was to deliver the car to the Utah Poultry Company at its place of business.

"The Utah Poultry Company and the Chipman Mercantile use the same industrial track and siding and in order to deliver the car of feed to that siding it was necessary to unlock and open gates across the railroad company's tracks to permit cars to enter the private premises of the companies above named. When said train reached the town of American Fork the crew thereof, consisting of Harrington and his fellow employees, detached the engine and the car of poultry feed from the train and moved down the main line about one-half mile, stopping at the switch leading to the siding of the Utah Poultry Company for the purpose of delivering said car of poultry feed; that the balance of the train was left one-half mile west of said point at said time in order to not leave said train within the business district of American Fork and in order to not obstruct the main street of said town with said train while the crew was switching and delivering said car of poultry feed to the Utah Poultry Company.

"That while delivering and spotting said car of poultry feed out of said interstate train it became necessary for said deceased to cross the public highway in American Fork in order to open said gates leading into the industrial siding into the Utah Poultry Company in order to enable deceased and other members of the crew to switch, deliver and spot said car of feed out of said interstate train; and while so crossing said highway to open said gate said deceased was struck by a motor truck being operated by Wayne Godfrey of Murray, Utah; * * *" (Harrington died shortly after from the effects of the injury.)

From the foregoing the Commission concluded "that at the time of said accident and injury said deceased and said B. L. Ball, as receiver of the Salt Lake and Utah Railroad Company were engaged in interstate commerce and said accident and injuries arose out of and during the course of interstate commerce."

The following statement of facts is agreed to by both parties. The diagram, not a scale drawing, will assist in following movements of the cars, engine, and parties:

Mr. Harrington was a brakeman of the crew which went on duty at Provo at 10:45 P. M., February 8, 1937. The crew proceeded to Springville, picked up some cars and continued on with their train toward Salt Lake City. The crew usually tied up at Provo. It was the practice for the northbound crew to meet the train southbound from Salt Lake City at Cutler. Cutler is a station about two miles north (railroad directions) from American Fork. The two trains met at Cutler about 5:30 A. M., on February 9, 1937. The crew of the southbound train took the northbound train and the crew of which Mr. Harrington was a member took charge of the southbound train. The southbound train contained 17 cars; 16 of these were received from the Union Pacific Railroad Company, at South Salt Lake and one car loaded with scrap paper was picked up at the Salt Lake industry track of the Salt Lake and Utah Railroad Company, one of the defendants herein. This car contained a shipment to the Pioneer Paper Stock Co., at Kalamazoo, Michigan, moving from

Salt Lake City to be delivered enroute to the Denver and Rio Grande Railroad at Grundy, a station near Provo, Utah. The train also contained a car of feed, moving from Salt Lake City to the Utah Poultry Company at American Fork, Utah. It is conceded that the entire train, with the exception of the car moving from Salt Lake City to Kalamazoo, Michigan, was wholly intrastate in character; but it is claimed in accordance with what is said to be the general

rule that the presence of the interstate car impressed the whole train as interstate.

After the exchange of trains by the crews, the crew, of which Mr. Harrington was a part, moved the southbound train to a point about half a mile from the American Fork Station, stopped it there out of the highway traffic, detached the car of feed and moved it up to near the American Fork Station and stopped it there. The engine was detached, moved into the house or station track, "light," coupled onto the car of coal, at a place marked first position of the car of coal, and moved it out over the curve to the main line. The engine then moved the car of coal east (south, railroad directions) where it was uncoupled and held by the brakes while the light engine moved down and north (west) past the switch so as to be able to take the house track lead. The switch was then lined up with the curve to the house track lead and the engine moved thence into the curve to permit the car of coal to roll by gravity down to the feed car. Harrington lined up the switch so as to permit the car of coal to roll down, and, pursuant to orders, walked east along the street and was crossing over to open the gate to permit the "light" engine to move into the Chipman yard. While Harrington was doing this the light engine was moving around the curve, the trolly man intending to manipulate the switch near the station to permit the light engine to move across the street into the Chipman yard. Just before the engine had reached the position beyond the switch, the trollyman shouted to the motorman to stop as Harrington had been injured. Harrington was beginning to cross the street approaching the gate when a truck traveling on the highway struck him, inflicting injuries from which he died. The last acts Mr. Harrington did, related in any way to the movement of any of the cars, was to line up the switch to permit the engine to return to the house track lead, or to re-align the switch to permit the coal car to roll down to the car of feed. The car of feed, the car of coal, and the cars on the industry track were all intrastate cars.

It is not contended that the car of coal had not lost its interstate character, although when delivered to the American Fork house track, it came out of a train impressed with interstate commerce; nor is it contended that the cars the light engine was proceeding to move were impressed with interstate commerce. From the time the feed car had been taken out of the train and the train had been left on the main line, all operations of the crew had been directed to the movement of cars intrastate in character. If it were contended that the car of coal was still impressed with an interstate commerce character, we think the position would be untenable. Both the car of coal and the cars in the Chipman yard had no interstate character. Their interstate character had terminated before the contemplated movements from their positions on the sidings were initiated. *Lehigh Valley Railroad Co.* v. *Barlow*, 244 U. S. 183, 37 S. Ct. 515, 61 L. Ed. 1070. These movements were in pursuance of an order from the station agent to take the car of coal and move it into the industry track of the Chipman Mercantile Company. The car of coal had been on the house track for a number of days.

Counsel for defendants contend that the task in which Harrington was engaged was ultimately to permit the spotting of the car of feed out of the interstate train as well as to permit the spotting of the car of coal, and maintain that the task of opening the gates was not separable from the major task of operating the train in interstate commerce. The confusion in the cases arises out of determining just how far a major task arising out of an operation impressed with interstate commerce may be followed into details, or be broken down into elements that may be followed ultimately into intrastate commerce. The distinction has not been made upon the basis of whether the crew was a road crew or a switching crew; but upon the work the crew or person was engaged in at the time of the injury. That the tracing of a series of operations and events may lead ulti-

mately to a particular circumstance or purpose, such as the spotting of the feed car, which was an intrastate shipment and was tagged, while in the train, with interstate commerce because there was one car in the train containing an interstate shipment, is not necessarily determinative of the task the crew was engaged in or the task of Mr. Harrington at the time of the injury which resulted in his death.

Harmonizing or distinguishing the cases cited by both parties is futile and would only add to what has many times been said: differentiation or harmonization is a matter of analysis and opinion, each case being determined upon its own facts, or its similarity or want of it to other cases. The courts have come to the general statement ■ that "each case must be decided in the light of the particular facts with a view of determining whether *at the time of the injury* the employee is engaged in interstate business, or in an act which is so *directly and immediately* connected with such business as substantially to form a part or necessary incident thereof." (Italics added.) *New York Central & Hudson River Railroad Co.* v. *Carr*, 238 U. S. 260, 35 S. Ct. 780, 59 L. Ed. 1298. This case and many others are discussed in the case of *Roach* v. *Los Angeles & S. L. R. Co.*, 69 Utah 530, 256 P. 1061, and the same case on a second appeal in 74 Utah 545, 280 P. 1053. In commenting upon the Carr Case, supra, this court, in 69 Utah 530, 256 P. page 1065, stated:

"Of necessity, each case, to a large extent, must depend upon its own facts. It would be difficult if not quite impossible to declare a precise and a universal rule applicable to and controlling in all cases."

There is no dispute or conflict in the evidence. It was all submitted by the defendants. Whether or not Mr. Harrington was engaged in interstate commerce at the time of the injury, although in the cases said to be a question of fact for the court or jury, it is, nevertheless, jurisdictionally, largely a conclusion from facts.

Let us restate the facts as they appear, with emphasis on details, rather than as they relate to the operation of a railroad engaged in both intrastate and interstate commerce, or a train so impressed because of a single car therein moving in interstate commerce.

The train left at Cutler, or on the main line some distance north of American Fork, was tagged as an interstate train because of the presence of a single car containing goods for interstate shipment. It is argued that this car of feed, an intrastate shipment, though detached from the train and moved into American Fork, still retained its interstate character. No contention is made that the car of coal had not lost its interstate character by having been spotted on the house track in the station yard for some days. The car of coal and the two cars in the Chipman Mercantile Co. and Utah Poultry Co. yard were directed to be removed by orders of the dispatcher at American Fork. Nothing appears from the record as to the details of the dispatcher's orders.

When the "light" engine left the coal car, it moved west to a place beyond the switch to the house lead. Then, after Harrington had lined up the switch so the engine could take the lead and it had passed on to the lead sufficiently to clear the main line so the car of coal might be permitted to roll down to the car of feed, Harrington realigned the switch with the main line. He did not ride the engine on its proposed journey to the Chipman Mercantile Co. and Utah Poultry Company yard. His last act, touching railroad property, or appliances, was the realigning of the switch with the main line. He then started his journey on foot for the purpose of opening the gate to permit the removal of two cars from the Chipman-Utah Poultry Co. yard. Those two cars were in no way impressed with or connected with interstate commerce business directly or indirectly; nor did the errand of opening the gate nor the movement of the "light" engine, from which, temporarily, Harrington was disconnected, in any way substantially form a part or necessary incident of interstate commerce. What was to be ultimately done with

those cars does not appear. At best it can rest only in intention. If the ultimate spotting of the car of coal or the car of feed, or both, was done in order that they might occupy the place of, or a place beyond the position occupied by the two cars on the industry track, it does not so appear. The errand or purpose of the operations in which the engine crew (including Harrington) was engaged was to move cars which were in no way connected with interstate business. Harrington's orders were to open the gate at the north side of the street to permit the engine to enter the Chipman-Utah Poultry Co. yard. Those cars, in so far as revealed by the record, were neither to be moved into nor out of a train directly and immediately connected with interstate commerce at the time the injury inflicted by a third party occurred to Harrington.

Since this cause was submitted, our attention has been called to a recent case decided by the Circuit Court of Appeals for the Eighth Circuit, reported in 94 F. 2d 117. The case, *Wabash Ry. Co.* v. *Bridal,* arose in Iowa. A brakeman was employed on what was known as a "turn-around" freight train between stations in Iowa. The crew did whatever switching was necessary at the intermediate stations. The trains carried local as well as interstate shipments. On the evening before the accident, a car containing a local shipment consigned to an intermediate station was taken out of the interstate train and "spotted" on what is known as the house track. At that time there was no agent at the station and the crew had no instructions as to where to place the car. The next morning, on the return trip, the train also had interstate shipments. When the train arrived at the station where the car had been temporarily spotted the night before, the train crew, there being no switching crew, was directed to spot the car at an unloading track. After the engine had moved the car to an approximate location and returned to the train, it was learned the car had not been properly placed. The conductor directed the movement of the car by means of pinchbars. The brakeman, for the purpose of

stopping the car on signal at the right place, took his position at the brake. When he undertook to set the brake and stop the car, by reason of a defective brake step he was thrown to the ground and injured. It was there held that the brakeman was doing work "so closely related to interstate transportation as directly to affect it." [Page 123.] Further, it was stated that "if he were injured and detained, it would delay the interstate movement of the train."

This case illustrates the application of a rule providing that a car temporarily spotted the night before had not lost its interstate character. What relation, if any, existed between the injury to the brakeman and a possible delay of an interstate train does not appear. In the case of *Sullivan* v. *Wabash Ry. Co.*, 6 Cir., 23 F. 2d 323, it is indicated that a yard switchman, injured while dropping an intrastate car on his way to get interstate cars, was engaged in interstate commerce under the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51-59, since dropping an intrastate car was merely an incident to a dominant interstate task. On the other hand, in the case of *Pope* v. *Utah-Idaho Central R. R.*, 10 Cir., 54 F. 2d 575, a switchman who intended to pick up and transfer interstate after placing intrastate cars was not engaged in interstate commerce. For further cases see *Peters* v. *Industrial Comm. of Utah*, 74 Utah 140, 277 P. 408.

This case does not come within the doctrine of the Carr Case, supra, nor within any of the cases that would require a holding as a matter of law that Harrington at the time of the injury was engaged in interstate commerce. The Industrial Commission, as indicated in its findings, refused to take jurisdiction of the matter. We think the Commission should have taken jurisdiction. *Murch Bros. Const. Co. et al.* v. *Industrial Comm. et al.*, 84 Utah 494, 36 P. 2d 1053, citing on pages 501 and 502, 36 P. 2d pages 1056, 1057, the case of *Luker Sand & Gravel Co.* v. *Industrial Commission*, 82 Utah 188, 23 P. 2d 225; *Angel* v. *Industrial Comm.*, 64 Utah 105, 228 P. 509; *Industrial Comm.* v. *Evans*, 52 Utah 394, 174 P. 825; *Miller & Lux* v. *Industrial Accident Comm.*, 179

Cal. 764, 178 P. 960, 7 A. L. R. 1291, and *Denver & R. G. R. R. Co.* v. *Industrial Comm.*, 60 Utah 95, 206 P. 1103.

The order of the Industrial Commission refusing to take jurisdiction is annulled and the cause remanded for further proceedings in accordance with the views expressed herein.

HANSON and LARSON, JJ., concur.

FOLLAND, Chief Justice (dissenting).

I dissent. The facts in this case are not nearly so complicated nor the federal cases, to which we must look for the applicable rule of law, so confusing as indicated in the Court's opinion. The case is comparatively simple. Plaintiff brought her action on the theory that her husband was killed while engaged in a train switching operation in intrastate or local commerce, and hence subject to the Workmen's Compensation Law of Utah, Rev. St. 1933, 42-1-1 et seq. The defense was that he was engaged in an operation which was in interstate commerce, and therefore the recovery for his death, if any, must be pursuant to the Federal Employers' Liability Act, 45 U. S. C. A. §§ 51-59. The question was one of fact, to be determined by the Industrial Commission as the fact finding body, guided by the rules laid down in such cases by the federal courts.

The Industrial Commission found from uncontradicted evidence that the deceased was engaged in interstate commerce. The court's opinion decides we must hold as a matter of law that the operation in which deceased was engaged at the time of his death was intrastate commerce. With this holding I cannot agree. The rule applicable is that announced in *New York Central & H. R. Railroad Co.* v. *Carr,* 238 U. S. 260, 35 S. Ct. 780, 59 L. Ed. 1298, to the effect that the switching of an intrastate car out of an interstate train is interstate commerce. In that case the employee, at the moment of injury was setting the brakes on cars which had been switched out of the train. This was a necessary task in connection with the aligning or setting of the cars.

There, as here, the movement of the interstate train was halted while the switching was done, and thereafter the workmen returned to the interstate train. Harrington at the moment of injury was crossing the highway for the purpose of opening the gates to the Chipman Mercantile-Utah Poultry Producers Association yard. This operation was necessary to the setting of the feed car in the yard of the Poultry Association.

The third paragraph of the Industrial Commission's Finding No. 3 reads as follows:

"That while delivering and spotting said car of poultry feed out of said interstate train it became necessary for said deceased to cross the public highway in American Fork in order to open said gates leading into the industrial siding into the Utah Poultry Company in order to enable deceased and other members of the crew to switch, deliver and spot said car of feed out of said interstate train; and while so crossing said highway to open said gate said deceased was struck by a motor truck being operated by Wayne Godfrey of Murray, Utah. * * *"

The Commission's finding has support in evidence establishing that the switching movement at American Fork was one transaction, having for its main purpose the spotting of the feed car, a car conceded to have been cut out of an interstate train, and therefore its movement was one in interstate commerce. We are not concerned with the justice or reasonableness of the rule which fixes the status of the workmen as in interstate or intrastate commerce. It is one made by the Supreme Court of the United States and is binding on us. In oral argument it was admitted by counsel for plaintiff to be a fair and just rule and one with which he had no quarrel. It was his contention that the rule did not apply because Harrington's last work was in the switching operation that had to do with the movement of the coal car, an intrastate transaction.

It was also conceded there could be no controversy in this case if the train crew had been engaged exclusively in spotting the feed car, that the whole transaction would have to be characterized as interstate. The question arises

because after cutting the feed car from the interstate train and before spotting it the train crew received orders to also spot a coal car which had been on the house track for two or three days. The switching of the two cars already spotted was a mere incident to the spotting of the feed car and the coal car. But for the spotting of the feed car and the coal car there would have been no necessity to move the two cars already on the house track. They were in proper place and were not yet ready to be taken away. All movements in the switching operation had been accomplished up to the point of moving out the two spotted cars so that the feed car and the coal car could be placed north of them. In order to move these cars out and the others in, it became necessary to open the gate. While approaching the gate, Harrington was fatally injured. To finish the movement would have required the engine to proceed north through the open gate, attach the two cars, draw them out to the main line, couple on to the coal car and feed car, draw the four cars south on the industrial track past the switch, then push them north on the same track, leaving the cars in this position, the feed car farthest north, the coal car next, and the two other cars returned to their former position. It is perfectly apparent that the opening of the gate and movement of the two spotted cars was merely incidental to the proper placing of the feed car and the coal car.

If, however, and this is conceded, the mere fact that one interstate car in the train of sixteen cars classifies the entire train and its movements as interstate, including the spotting of cars for local delivery, then we cannot escape the conclusion that this switching operating must also be so characterized. The mere fact that the switching operation included an intrastate car of coal could not change the character of the switching of the feed car to an act in intrastate commerce.

Plaintiffs' argument was that the interstate feed car was left at rest on the main line, and the following switching operations related to the intrastate car of coal, and that

while engaged in an act necessary to the movement of that car, Harrington was injured. They say:

"In the Harrington case the period of time that separates the state from the interstate work is when the feed car was left west of the switch at American Fork, with the brakes set, and the crew took up the separate task of moving the intrastate coal car to the Chipman Mercantile Company industry track and the further separable task of moving two intrastate cars on the industry track to make room for spotting the coal car and perhaps also the feed car."

Whether that is true or not is a question of fact which was for the Commission. The evidence supports its finding. The opening of the gate and movement of the two spotted cars were just as necessary to the spotting of the feed car as to the coal car. The feed car was not to be left on the main line where it remained temporarily with brakes set—not even while the coal car was spotted—but only while the crew placed the other cars in proper sequence so as to spot the feed car on the house track of the Utah Poultry Producers' Association and the coal car between it and the other two cars. Plaintiffs placed no reliance on a theory which would segregate each act of the switching operation. The intention clearly was to spot the feed car before moving on to the next station with the interstate train which was left on the main line track on the highway. Indeed, the feed car had to be moved and spotted before the train could proceed because it was on the main track and unless moved would block the way. The entire switching operation was one movement looking to the spotting of the feed car.

Plaintiffs concede that if the feed car had been directly taken to the gate, the opening of it would be incidental to interstate commerce and Harrington's act so characterized and his status fixed—not because the gate was intrastate, but because the car switched was interstate. The movement must also be interstate if it was necessary to move the two spotted cars in order to set the feed car behind them.

If the gate was opened to permit an interstate car to pass, the operation was one in interstate commerce; if it was

opened to permit an intrastate car to pass, the status is one in intrastate commerce. What is the status when it is opened for an interstate and an intrastate car to pass in the same switching movement? Under the theory of the Carr Case the whole movement is colored or characterized by the interstate car. Harrington therefore was acting in interstate commerce.

The findings and conclusions of the Industrial Commission are fully supported by evidence and should be affirmed.

WOLFE, Justice (dissenting).

I concur in the opinion of Mr. Chief Justice FOLLAND that in this case, according to the tests laid down by the courts in determining whether an act is done in interstate commerce so as to make applicable the Federal Employers' Liability Act, 45 U. S. C. A. §§ 51-59, the decedent was engaged in interstate commerce.

However, it seems to me that one important question of the case has not been touched upon, and that is the question as to whether the Industrial Commission, in determining whether it has jurisdiction under Section 42-1-89, Rev. St. Utah 1933, in an application for compensation, is required to apply the same tests that the courts have laid down to give the employee engaged in the railroad industry extended protection under the Employers' Liability Act.

The courts have gone far to hold a particular act as interstate commerce so as to give the employee the benefit of the Federal Employers' Liability Act. Where in no way the employee can take advantage of the Employers' Liability Act, as in this case, because no negligence on the part of the railroad, should there be a different standard of determining whether or not the work in which the employee was engaged at the time of the accident was interstate commerce? I think not. The standards and tests laid down by the courts for the determination of what is an interstate commerce act for purposes of ascertaining whether the Liability Act

applies must be applied to determine whether the Commission has jurisdiction under Section 42-1-89. The interstate employer is in position to say: "What is good for the goose is good for the gander." When the employee asserts negligence on the part of the railroad, he receives the benefit of decisions which hold such an act as Harrington was engaged in at the time of the accident as interstate commerce. Simply because there was no negligence, the dependents of Harrington cannot take the position that the act was an intrastate act. I hardly think we can give an act the aspect of interstate commerce for the purpose of the Federal Employers' Liability Act and the same act the aspect of intrastate commerce under Section 42-1-89. That reads as follows:

"The provisions of this title shall apply to employers and their employees engaged in intrastate and also in interstate and foreign commerce for whom a rule of liability or method of compensation has been or may be established by the congress of the United States, only to the extent that their mutual connection with intrastate work may and shall be clearly separable and distinguishable from interstate or foreign commerce."

It is abstruse and involved. I think it was intended to enable a definite horizontal separation of those employees "connected with intrastate work" when their work was clearly separable and distinguishable from interstate work, not according to a test which depended upon the nature of the particular work the employee was doing at the time of the accident, but by a test of whether their regular work was connected only with intrastate commerce. The theory was that an employer engaged in both intra- and interstate commerce or his insurer should be able to count before hand and clearly classify those employees engaged entirely, definitely, and regularly in intrastate commerce. The section was never intended to give the Commission jurisdiction of a case where the employee might at one moment be engaged in intrastate and the next moment in interstate commerce, just because at the time of accident his work hap-

pened to be intrastate. To illustrate: If certain employees were altogether regularly engaged in auditing intrastate freight bills, they could be definitely classed as amenable to the jurisdiction of the Commission before an accident occurred, and security for payment of compensation could be provided for. And the case where a powerline or a telephone building is being constructed but not yet ready for use in interstate commerce is another example of a different kind. *Shurtliff* v. *O. S. L. R. Co.*, 66 Utah 161, 241 P. 1058; 14 A. L. R. 732, Note; *State* v. *Postal Telegraph-Cable Co.*, 101 Wash. 630, 172 P. 902, reaffirmed, 104 Wash. 693, 176 P. 346.

That this was the meaning of Section 42-1-89 is more strongly apparent when we consider its carefully chosen language. Down to the word "only" the section is descriptive of the class of employers and employees to which the "only" clause applied. A free translation of the section is as follows: When you (the Commission) are dealing with the employer-employee relationship in those cases where the employer is engaged in both sorts of commerce, *and* a rule of liability or a method of compensation has been established by Congress (all this descriptive of the employer and therefore of the employees engaged by him) take cognizance only of those employees whose *connection* with intrastate *work* is such that it may and can be clearly separated from interstate commerce. The section specified not the job the workman happened to be doing at the time of the accident, but that he had to be *connected* with intrastate work, and this connection had to be clear. The work at which he was employed had to be intrastate—not just the particular act which engaged him at the time of the accident. The work with which he was connected had to be so clearly distinguishable from interstate commerce as to permit one classifying employees as interstate or intrastate to say which field they were connected with. The intrastate work not only may, but shall, be clearly separable from interstate commerce, i. e., shall be independent of any accident. The

reason was that it was not intended to await an accident and then look back to see to what employees the jurisdiction of the Commission attached. But alas, the courts early construed this section so as to make the nature of the act at the time of the accident the test of whether the employee was engaged in intrastate or interstate commerce. The closest cases to the other theory are *Miller* v. *United Fuel Gas Co.*, 88 W. Va. 82, 106 S. E. 419; *Suttle* v. *Hope Natural Gas Co.*, 82 W. Va. 729, 97 S. E. 429; *Powers* v. *Murray*, 266 Mich. 688, 254 N. W. 559.

In this jurisdiction we have made the work at the time of the accident the test. *Roach* v. *Los Angeles & S. L. R. Co.*, 69 Utah 530, 256 P. 1061; *Denver & R. G. W. R. R.* v. *Ind. Comm.*, 60 Utah 95, 206 P. 1103; *Utah Rapid Transit Co.* v. *Ind. Comm.*, 59 Utah 232, 204 P. 87; *Conway* v. *So. Pac. R. Co.*, 67 Utah 464, 248 P. 115, 49 A. L. R. 1316; *Southern Pac. Co.* v. *Ind. Comm.*, 71 Utah 248, 264 P. 965. The rule that the nature of the work at the time of the accident governs the classification seems deeply rooted here and elsewhere.

Since, therefore, the test of whether the employee is in the intrastate or interstate field depends on the character of the act he is doing at the time of the accident, the question arises can an act which is characterized as interstate commerce for the purpose of giving the employee a recovery for negligence under the Federal Employers' Liability Act be characterized differently as intrastate work so as to make the Workmen's Compensation Act applicable. Certainly the act of hauling a mixed train of intrastate and interstate cars cannot be separated as to interstate and intrastate work. It is all interstate. But it is arguable that in certain cases, including the instant case, although the deceased was at the time of the accident engaged in interstate work, as far as the protective application of the Federal Employers' Liability Act is concerned because it was all incidental to the interstate function of the ultimate spotting of an intrastate car taken from an interstate train, yet the intrinsic

quality of the act was in its nature intrastate. In other words, while the courts endeavored to go as far as possible to find an act part of interstate commerce, so as to bring all employees possible under the protection of the Federal Employers' Liability Act, and thus characterize acts in quality intrastate, as interstate because incidentally connected or reasonably approximate to the work of interstate movement, yet if there was no negligence of the interstate employer involved and therefore no reason for extending the protection of the Liability Act, the work at the time of the accident being in quality intrastate would, so far as compensation is concerned, be considered as intrastate work. I fear such classification would bring about great confusion. Mr. Justice Brandeis in his dissenting opinion in the case of *New York Central R. Co.* v. *Winfield,* 244 U. S. 147, 37 S. Ct. 546, 61 L. Ed. 1045, L. R. A. 1918C, 439, Ann. Cas. 1917D, 1139, concluded that an act in *interstate* commerce, not covered by the Federal Employers' Liability Act because there was no negligence, was compensable under the New York compensation act as if it had been purely intrastate work. But the majority of the court was the other way. The court held that even if Congress did not cover all situations wherein an accident occurred, but only those with a negligence foundation, it nevertheless intended to occupy the field of regulating the matter of an employee's rights for injury while engaged in *interstate* commerce. Hence the jurisdiction of the states, by such expression of congressional will to preempt the field, was ousted. And this is the reason why the phrase "for whom a rule of liability or method of compensation has been or may be established by the congress" was inserted in the State Act as part of the description of the class of employers carrying on both kinds of commerce who must respond for compensation only for accidents occurring in intrastate work. Certainly if the Supreme Court of the United States refused to permit the state compensation law to apply to an accident in interstate commerce not covered by the Federal Employers' Liability

Act, it is difficult to see how that principle could be circumvented by calling an act dominated as interstate commerce for purposes of the Federal Employers' Liability Act, as an intrastate act because it had an intrastate quality, for purposes of making the state compensation act apply. If the Federal Employers' Liability Act completely occupies the field of regulation of employers' obligations to employees for accidents occurring in interstate commerce, then the test of *interstate* commerce for the purpose of ascertaining the extent of that field over which the Employers' Liability Act operates to the exclusion of the state compensation acts must be the same as is laid down by the courts when a workman sues under the Federal Employers' Liability Act. Mr. Justice Brandeis did not attempt to place his dissent on the basis that an act found to be interstate by the tests used when the Federal Employers' Liability Act was invoked should be considered intrastate when it was not covered by said act. He took a sounder and broader position that, even though an interstate act, since it was not specifically covered by the Employers' Liability Act because no negligence was involved, it should be held that Congress had not intended to cover or legislate in regard to that situation and that Congress had not preempted that part of the field of employer-employee relationships in *interstate* commerce. He recognized that the state's jurisdiction to legislate in matters of local concern in interstate commerce adheres until Congress speaks on the subject matter. He then took the position that the subject matter in regard to which Congress spoke when it passed the Federal Employers' Liability Act was on the employer's *liability for negligence* to its employee injured by reason of such *negligence* while engaged in interstate commerce. The majority of the court took the position that the subject matter in regard to which Congress spoke was the total subject matter of the employer's liability in case of injury suffered by an employee engaged in interstate commerce, regardless of whether it occurred by negligence of the employer or some third party or whether it was

caused by no negligence. The fact that there would be some situations in which the employee could not recover because his master was not negligent did not prevent Congress from having entered and spoken regarding the complete field of liability of the employer for injury to his employee. While I think much can be said for the position of Mr. Justice Brandeis, we are bound by the majority opinion. That being so, the tests by which it is to be determined whether an employee was engaged in interstate commerce for the purposes of determining whether the Federal Employers' Liability Act applies must also be used to determine what act is an intrastate, as distinguished from an interstate, act in order to determine under Section 42-1-89, Rev. St. Utah 1933, whether the Industrial Commission has jurisdiction. And in applying such tests to determine whether Harrington was at the time of the accident engaged in intrastate or interstate commerce, I must agree with the analysis of Mr. Chief Justice Folland. His opinion sets out why in the instant case the deceased was engaged in interstate commerce at the time of his death. I concur in the conclusion that deceased was so engaged in interstate commerce. And being so engaged for the reasons stated above the compensation act of our state is excluded from operation.

For the above reasons I dissent from the prevailing opinion.